STARR INTERNATIONAL CO., INC., Plaintiff and Counterclaim–Defendant,

v.

AMERICAN INTERNATIONAL GROUP, INC., Defendant and Counterclaim–Plaintiff.

No. 05 Civ. 6283(JSR).

United States District Court, S.D. New York.

Aug. 31, 2009.

---

George Abraham Zimmerman, Lauren Emily Aguiar, Skadden, Arps, Slate, Meagher & Flom LLP (N.Y.C), Nicholas A. Gravante, Jr., Christopher Emmanuel Duffy, Dawn Louise Smalls, Steven Ian Froot, Boies, Schiller & Flexner, LLP(N.Y.C), New York, NY, Steven J. Kolleeny, Skadden, Arps, Slate, Meagher & Flom LLP (DC), Washington, DC, for Plaintiff.

Martin Flumenbaum, Eric Alan Stone, Robert A. Atkins, Roberta Ann Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison LLP (N.Y.), New York, NY, for Defendant.

David A. Schulz, Nicole Armenta Auerbach, Levine, Sullivan, Koch & Schulz, LLP(N.Y.C), New York, NY, for Movant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT

JED S. RAKOFF, District Judge.

"Put it in writing" is the law's way of saying "get serious." In many circumstances, oral commitments are just too slippery to be enforced, a fact of human nature that the English Parliament recognized as early as 1677 when, declaring that certain contracts were unenforceable if not reduced to writing, it enacted what was tellingly called "An Act for the Prevention of Frauds and Perjuries," 29 Car. 2, ch. 3, now known to every lawyer as the Statute of Frauds. Here, in the central claim of this case, defendant and counterclaim-plaintiff American International Group, Inc. ("AIG") seeks to impress upon plaintiff and counterclaim-defendant Starr International Company, Inc. ("SICO") a multi-billion dollar oral trust in AIG's favor; but the law will not recognize such an oral trust unless the evidence of its creation is unequivocal. As detailed below, this is a burden that AIG has not come close to shouldering.

By way of brief background, this lawsuit originated in July of 2005 when Maurice R. ("Hank") Greenberg, who had previously functioned as the prime mover of both AIG and SICO, was forced to step down as Chief Executive Officer ("CEO") and Chairman of AIG. SICO, which remained under Greenberg's domination, then brought this action to recover from AIG certain artwork and other property that was said to belong to SICO. Those claims were eventually settled, but in the mean-

time AIG filed no fewer than seven counterclaims, alleging, among other things, that certain AIG stock held by SICO was held in trust for AIG's benefit. SICO, for its part, filed its own counterclaim seeking a declaratory judgment that AIG is not a "controlling person" or "affiliate" of SICO under the federal securities law (an issue that bears on SICO's ability to dispose of its AIG stock).

The case was originally assigned to the Honorable Barbara S. Jones, U.S.D.J., who, following extensive discovery and motion practice, issued a learned opinion in June, 2008, dismissing four of AIG's counterclaims—two for breach of contract, one for unjust enrichment, and one for constructive trust. *See* Order dated June 23, 2008. Then, after the case was reassigned to the undersigned in February 2009, the parties settled SICO's original claims by stipulating that SICO was the owner of the artwork and other property at issue, *see* Stipulation of Judgment dated March 20, 2009. The Court then set a firm trial date of June 15, 2009 and, on the first day of trial, dismissed as moot AIG's declaratory judgment counterclaim and severed SICO's declaratory judgment counterclaim. *See* Trial Transcript ("Tr.") 5–6.

Accordingly, the two claims that remained for trial were, first, AIG's breach-of-trust counterclaim, which alleged that SICO held certain AIG stock subject to an express trust for the benefit of AIG and that SICO had breached this trust,[1] and,

second, AIG's conversion counterclaim, which principally alleged that SICO had converted to its own use and benefit the AIG stock SICO supposedly held in trust. Although the first of these two claims was to be determined by the Court and the second by the jury, the two were closely intertwined—indeed, the primary theory on which the conversion claim rested presupposed the existence of the alleged trust, from which funds were then allegedly converted—and consequently the Court ruled that a jury, in addition to deciding the second claim, would be asked to render an advisory verdict on the first claim, pursuant to Fed.R.Civ.P. 39(c). *See* Memorandum Order dated June 4, 2009.

The trial itself took three weeks. The presentations by both sides were models of good lawyering, and the very intelligent jury was plainly able to follow the case without difficulty. In the end, it appears that the case was not, in the jury's eyes, a close one, for the jury, after less than a day of deliberations, returned a verdict finding SICO not liable on either the breach-of-trust claim or the conversion claim. Tr. 3046–47. But while the verdict on the conversion claim is binding on this Court, the Court, though taking account of the jury's advisory verdict, must render its own verdict on the breach-of-trust claim. *See DeFelice v. American Int'l Life Assur.*, 112 F.3d 61, 65 (2d Cir.1997). To this end, the Court hereby makes the following findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a)(1).[2]

---

1. AIG sometimes refers to its breach of trust counterclaim as a breach of fiduciary duty counterclaim, but, as discussed below, the Court has previously determined that the only breach of fiduciary duty still properly at issue on this counterclaim is the alleged breach of the alleged express trust.

2. SICO also moved, at the close of AIG's case, for judgment as a matter of law as to AIG's conversion claim, pursuant to Fed.R.Civ.P. 50(a), and for judgment on partial findings as

to AIG's breach-of-trust claim, pursuant to Fed.R.Civ.P. 52(c). The Court reserved decision on both motions and deemed them renewed at the close of all of the evidence. *See* Tr. 1854, 2376. The jury's finding of no liability on AIG's conversion claim rendered the former motion moot; however, SICO's Rule 52(c) motion remained to be decided. Because, however, the Court's findings of fact and conclusions of law, below, address all of the issues raised in SICO's Rule 52(c) motion, and because the Court finds in favor of SICO

## FINDINGS OF FACT

The Court makes these findings of fact based on its assessment of the evidence of record,[3] reasonable inferences drawn therefrom, assessment of credibility, and resolution of conflicts in the evidence. No attempt is made to give transcript or exhibit citations for each and every finding, and where such references are occasionally made, they are intended to indicate some but not necessarily all of the direct evidence pertaining to a given finding. Certain additional findings of fact are made, where appropriate, in the subsequent section on Conclusions of Law.

An added word on the issue of credibility is called for. Credibility determinations are among the most subtle a fact-finder is called upon to make, since they involve complex assessments of demeanor, bias, motive, consistency, probability, memory, and a host of other factors. Rare is the witness whose memory is so perfect and whose powers of observation are so acute that his testimony is a perfect reflection of what actually occurred. Self-interest, moreover, creates such a powerful incentive to shade the truth that it is unusual for an interested witness to be totally candid.

Here, in seeking to carry its burden, AIG relied heavily on adverse inferences it asked judge and jury to draw from what it argued was Hank Greenberg's false testimony, suggesting that Greenberg lied to cover up the express trust AIG claimed had been created. It was the Court's distinct impression, based on the jurors' "body language," that the jury did not credit certain portions of Greenberg's testimony; but the jury found in SICO's favor nonetheless. Similarly, the Court, having made its independent assessment of Greenberg's credibility, concludes that his testimony and the truth did not always converge; but the inaccuracies were not as material as AIG argued nor warranted the sweeping adverse inferences AIG hypothesized. As set forth in more detail later in these findings, the inaccuracy of parts of Greenberg's testimony sometimes simply evidenced confusion on his part. At other times it was the product of prevarication, but not to the point of making a material difference in the Court's overall assessment of the evidence. And, at still other times, his testimony was, in the Court's view, entirely truthful. In the end, however, it was the other evidence, and not Greenberg's testimony, that this Court found persuasive in reaching its verdict.

Turning, then, to the findings of fact:

AIG and SICO have a shared history that goes back to 1919, when Cornelius Vander Starr founded an insurance company in Shanghai. The business expanded rapidly, and, following Mr. Starr's death in 1968, his successor, Hank Greenberg, developed the business to the point where AIG became, by some measures, the world's largest insurance company. The instant dispute, however, ultimately derives from a reorganization that occurred in 1970, early in Greenberg's tenure. Prior to this reorganization, SICO—which was at the time called American International Underwriters Overseas, Inc.[4] and which was then and remains now a private company—owned a number of insurance

---

on the merits, SICO's Rule 52(c) motion is now moot as well and so need not be decided separately.

**3.** For various reasons set forth in the transcript, a few items of evidence were received by the Court only, and not by the jury. *See, e.g.,* Tr. 474. While the Court has carefully

considered these items, none of them is material to the Court's decision.

**4.** For simplicity, both SICO and its predecessors will be referred to hereinafter as "SICO," even when describing events that took place prior to the name change to SICO.

agencies located outside the United States. *See* Tr. 670–71. AIG, which had been founded in 1967 and which had gone public in 1969, owned several insurance companies that operated in the United States and abroad. AIG Trial Exhibit ("ATX") 29 at 16; Joint Statement of Agreed Upon Facts and Other Matters ("Joint Statement of Facts") ¶¶ 5, 18–19. The majority of AIG stock was owned by another public company called American International Reinsurance Company, Inc. ("AIRCO"), and both AIRCO and SICO were in turn controlled by a private company called C.V. Starr & Co, Inc. ("C. V. Starr"). ATX 29 at 5.

In the course of the 1970 reorganization, substantially all of SICO's assets, including all of its insurance operations, were transferred, first, to a SICO subsidiary, then to AIRCO, and then to AIG. *Id.* AIG, in turn, transferred 1,700,000 shares of its common stock to AIRCO, and AIRCO in turn transferred approximately 1 million shares of its stock to SICO. *Id.* This latter group of shares was termed the "Acquired Stock," and, when AIRCO and AIG subsequently merged in 1978, the AIRCO shares were exchanged for AIG shares, so that the Acquired Stock thereafter consisted of AIG shares. Tr. 682. At the time of the 1970 transaction, the Acquired Stock was worth approximately $105–$130 million. *Id.* at 2053.

All of the companies involved in the 1970 reorganization had substantially overlapping, though not identical, management. The nine directors of C.V. Starr in May 1970, when the reorganization was underway—it closed on June 30, 1970, *see* SICO Trial Exhibit ("STX") Z–6—were Greenberg, John Ahlers, Edwin Manton, John Roberts, Ernest Stempel, Gordon Tweedy, K.K. Tse, Houghton ("Buck") Freeman, and Francis Mulderig. Joint Statement of Facts ¶ 7. All of these men were directors of AIG, ATX 29 at 5–6; all except John Roberts were directors of AIRCO, *id.;* and all except Francis Mulderig were among the twelve Voting Shareholders of SICO, *compare* STX C at 3 *with* ATX 29 at 5–6. Greenberg himself was Director, President and CEO of AIG, Director and President of C.V. Starr, Director and Vice Chairman of AIRCO, and a Voting Shareholder of SICO. ATX 29 at 5. In addition, AIG had eight independent directors. *Id.* at 5–6.

Although this group of overlapping managers had the power to effectuate the 1970 reorganization, AIG took various steps, as a public company, to comport with its obligations to its shareholders. AIG therefore solicited and received an opinion dated February 19, 1970 from Morgan Stanley & Co., confirming the fairness of the reorganization to AIG's shareholders, STX CC at 210–13, as well as a "bring down" letter confirming this opinion on May 29, 1970, STX Z–10. Both these opinions confirmed that 1,700,000 shares of AIG stock was a fair price for the assets of AIRCO/SICO. The AIG Board of Directors then voted on the reorganization plan at a meeting held on May 13, 1970, at which its independent directors comprised a majority of those present. *See* STX Z–7. Finally, AIG submitted the plan to a shareholders' vote at a special meeting on June 29, 1970 and received the shareholders' approval. *See* STX CC at 58–61.

Various steps were taken at the time of the 1970 reorganization in order, among other things, to 1) allow for incentive compensation to be paid to AIG employees and certain other employees going forward, and 2) place certain restrictions on what SICO could do with the Acquired Stock. These steps are memorialized in the numerous documents associated with the transaction, most but not all of which are collected in a "deal book." *See* STX CC.

Prior to 1970, an incentive compensation and profit-sharing program known as the "Junior Preferred" program was in place at SICO, which, as the name implies, involved several series of subordinated preferred stock. Tr. 350–51, 493. Specifically, the Articles of Incorporation of SICO provided for the issuance of 2 million shares of Junior Preferred Stock. ATX 38 at 1. These 2 million shares were divided into 20 series of 100,000 shares each, denominated "Series One," "Series Two," etc., with each series corresponding to a period of five years. *Id.* at 3. The period of Series One was 1945–1949; the period of Series Two was 1950–1954, and so on, with the final series provided for in the Articles of Incorporation running from 2040 to 2044. *Id.* The Voting Shareholders of SICO had the power to determine the value to be assigned to the Junior Preferred stock each year during the five-year period of a given series, *id.;* Tr. 1056, 2176; and at the end of each five-year period, a holder of the Junior Preferred stock applicable thereto was entitled to receive the accumulated value assigned to her shares in the form of a series of payments that were spread out over roughly ten years, Tr. 2185–87; *see also* ATX 38 at 3. There was no requirement that the holders of any series of Junior Preferred Stock remain at the company for any given period of time—not even to the end of the relevant five-year period—in order to receive this payout. Tr. 944.

On June 3, 1970, as part of the 1970 reorganization, SICO's Articles of Incorporation were amended in several ways relevant to this discussion. To begin with, the method of valuing the Junior Preferred Stock was changed so that only the book value, rather than the market value, of the stock SICO would acquire in the reorganization would be taken into account and distributed to Junior Preferred Stockholders. *See* STX F–3 at 2–3; STX BU at 3; STX C at 2; ATX 61 at 2–3. This change

was effective beginning with Series Six of the Junior Preferred Stock, which ran from 1970–1974. ATX 61 at 2–3. The stock that SICO received was designated "Acquired Stock" and the difference between the book value and the fair market value of the Acquired Stock was designated the "Restricted Surplus." STX CC at 84–85. The amended Articles provided that neither Acquired Stock nor Restricted Surplus could be used to pay any dividends on Junior Preferred Stock, *id.* at 82. The effect of these changes was that, even though SICO received around $130 million in value when it transferred its insurance business to AIG, this value, in the form of the Acquired Shares, was not distributed to either the Voting Shareholders nor to the holders of Junior Preferred Stock Series Six (the most significant of whom were, again, the Voting Shareholders), but rather was set aside for future use. *See* ATX 61 at 3; Tr. 1055–57, 2183.

SICO's Articles of Incorporation were further amended to create a new class of Common Stock. STX F–3 at 2. As arranged, those shares were then acquired by the American International Charitable Trust of Bermuda, for the nominal consideration of $1 per share. ATX 154; STX BU at 4; STX C at 3. Then, in June 1971, the assets of the American International Charitable Trust were transferred to the Starr International Charitable Trust and the American International Charitable Trust was terminated. *See* ATX 155. As a result, the Starr International Charitable Trust (hereinafter, the "Charitable Trust") has been the sole holder of SICO Common Stock since 1971. *See* Tr. 701.

SICO's amended Articles of Incorporation also provide that the holders of the Common Stock receive all of SICO's assets upon the dissolution of the company (after all obligations on SICO's other classes of stock and outstanding debts are paid).

STX F–3 at 2. At the time of the events just described, several other amendments were made to SICO's Articles of Incorporation to afford further protection to the holders of Common Stock (which, as noted, became the Charitable Trust). The amended Articles provide that without the consent of the holders of a majority of outstanding shares of Common Stock, 1) the right of the holders of Common Stock to receive the assets of SICO upon its dissolution cannot be abridged, STX CC at 84; 2) no amendment may be made to the provision of the Articles that states that dividends on Junior Preferred Stock cannot be made in Acquired Stock or from the Restricted Surplus, *id.* at 84, 82; and 3) no change may be made to the definition of Acquired Stock or Restricted Surplus, *id.* at 84–85.[5]

At the same time that the above-described arrangements were being made with regard to the Charitable Trust, a "companion trust," in Greenberg's words, ATX 2 at 5; Tr. 1317, was also set up at C.V. Starr. Initially in 1970, C.V. Starr had placed AIG shares representing the difference between the book value and the market value of the assets it transferred to AIG during the 1970 reorganization in a "Blocked Account," Tr. 895–96, 1322–23, 1476, occasionally referred to as the "Trust Account," *see* ATX 501 at 1; *cf.* Tr. 1326–

27. Dividends from the AIG stock in the Blocked Account, as well as some shares of the AIG stock itself, were periodically paid to C.V. Starr according to a "trickle out formula." Tr. 1322–23. In 1977, a written trust agreement was executed, STX E, which provided, among other things, that C.V. Starr, the grantor of the trust, would receive "trickle out" payments under approximately the same formula, Tr. 1323, and that if C.V. Starr were dissolved prior to the termination of the trust, all of the shares in the Blocked Account would go to the Starr Foundation or some other charity, STX E at 8; Tr. 897.[6]

In 1970, the Voting Shareholders of SICO signed a "Memorandum of Intent" stating the purpose of the foregoing amendments.[7] It stated that

> [t]he intent of the Voting Stockholders in making these charter amendments is quite simply to insure that if the contemplated transaction with AIG is completed, with the result that the corporation will receive assets (AIRCO stock) having a market value many times in excess of the book value of the corporation's assets transferred therefor, no holders of any Series of Junior Preferred Stock will be in a position to divide among themselves this substantial increment. While the corporation remains alive, the increment is ignored in

---

5. In 1981, the Articles of Incorporation were further amended to provide that the Acquired Stock could not be disposed of for less than its full and fair value without the approval of the holders of a majority of the outstanding shares of Common Stock. STX BO at 2. And by 2004, the Articles had also been amended to provide that no change in the total number of shares of Common Stock was permissible without the approval of such a majority. STX F–1 at 5–6. *See generally* Tr. 837–47.

6. The reason for the decision to create a formal trust in 1977, seven years after the Blocked Account was created, was apparently a concern that the blocked account mecha-

nism might be considered void under the Rule Against Perpetuities. Tr. 1323.

7. The first version of the Memorandum of Intent was executed on May 14, 1970. *See* STX C. A revised version was circulated and signed in October 1970. *See* STX BU. Contrary to some arguments made by AIG, the Court finds that the revisions were intended simply "to spell out that in the event of stock splits or stock dividends, annual earnings and any increase in the annual earnings will be appropriately adjusted," STX BU at 1, and that, in any event, the differences between the two documents are not material to the issues in this case.

valuing each successive Series commencing with Series 6 and if the corporation should be dissolved and liquidated, the increment will go to the holder of the common stock, which it is intended will be American International Charitable Trust of Bermuda.

STX C at 2–3; STX BU at 4. A similar statement was made in a May 12, 1970 memorandum from Duncan Lee (who was, in 1970, Vice President, Secretary, and General Counsel of AIG as well as Vice President, Secretary, and General Counsel of C.V. Starr, ATX 29 at 6) summarizing the proposed charter amendments to the Directors of C.V. Starr and the Voting Shareholders of SICO:

> As a result of these amendments, no present or future stockholders of [SICO] will be entitled to receive any of the excess value of [SICO] represented by the difference between [the] net worth of [SICO] as shown on the current balance sheet and the current market value of AIRCO. Future holders of [SICO] will share in the growth of AIRCO only to the extent that it is reflected by an increase in the true value of such stock occurring after the reorganization.

ATX 61 at 3.

In 1992, the Voting Shareholders of SICO, including Greenberg, signed a "Statement of Commitment" that again set forth the history of the 1970 transaction and its import for SICO and AIG. Each Voting Shareholder signed the Statement of Commitment under oath, and each individual signed copy was notarized. *See, e.g.*, ATX 5; ATX 6; ATX 7. The preamble to this document reads, in relevant part,

> I hereby declare that as a voting shareholder of SICO that [sic] I shall adhere to, uphold and continue to carryout [sic] the commitments, principles, and arrangements as described generally hereinafter and as provided in detail in the existing articles and byelaws [sic] of

SICO, and in any preceding resolutions, commitments and agreements of SICO's voting shareholders and directors and in such trusts documents [sic] or other legal arrangements that have been [previously] established . . . .

ATX 5 at 1. The document then goes on to relate the history of the 1970 reorganization as it pertains to SICO, *id.* at 1–2, and, specifically, states that

> [t]he voting shareholders of SICO and C.V. Starr & Co., . . . in an extraordinary decision, decided that the large capital value of AIG held by SICO and C.V. Starr & Co. had been created through the outstanding performance on the part of two generations of AIG people (or its predecessor companies) and it should not be used to enrich the then shareholders but instead preserved to provide incentives for succeeding generations to continue the growth of AIG. Thus, the series of SICO Deferred Compensation Profit Participation Plans were created,

*id.* at 2. The Statement of Commitment further states,

> [i]n addition to its holdings of AIG stock, SICO has accumulated other assets that could be used to bolster the capital of AIG or C.V. Starr & Co. in the event of some unforeseen catastrophic event. To see that this capital is kept intact and preserved for use only in the occurrence of such an event and not diverted to the benefit of future SICO shareholders, the founding voting shareholders of SICO put in place a number of restrictions that limit access to such funds, including their ultimate contribution to a charitable trust if the voting shareholders or another group attempt to violate the terms of the trusts or restrictions. However, the best possible prevention against improper diversion of assets has always been to see that the voting

shareholders are only composed of individuals who share the same values and understand and believe that they are fiduciaries of the wealth created by past generations for the benefit of future generations. *Id.* at 3. The document concludes with a section entitled "Affirmation of Commitment" in which the signer "reaffirm[s his] belief and commitment" to SICO's policies, including, among other things, an incentive compensation system that "creat[es] a continuity of interest between management and shareholders," *id.* at 5, and also affirms that any new Voting Shareholders should similarly be committed to these principles, "thus ratifying and confirming the intent of the founding voting shareholders who established these principles to perpetuate the continuity of AIG into the unforeseeable future," *id.*

Over the years, and prior to Greenberg's forced departure from AIG in 2005 (discussed below), additional purposes for the amendments were occasionally voiced. In particular, Greenberg repeatedly stated that one goal of the reorganization, which lodged a block of stock representing approximately one fourth of AIG's market capitalization in SICO, a private company, was to fend off any attempts at a hostile takeover of AIG. *See, e.g.,* ATX 78 at 2; ATX 3 at 2. There were also a few occasional statements, prior to 2005, to the effect that one of the purposes of SICO's structure was to build funds for charitable purposes. *See, e.g.,* STX A at 2, 13 (auditors' statement).

In any event, from 1970 through the end of 2004, a portion of the Acquired Stock was used to fund long-term incentive compensation at AIG. During this period, there was one significant change in the means of providing this compensation. In 1975, after Series Six of SICO Junior Preferred Stock had concluded, a new system of incentive compensation was put in place

called the Deferred Compensation Profit Participation Plan, or "DCPPP." *See* ATX 104 (announcing the inauguration of the first DCPPP). The new system (sometimes also referred to as the "SICO Plan") was apparently developed in response to concerns that, first, employees tended not to appreciate the value of the Junior Preferred Series as part of their compensation package because of the delayed payout, *see* ATX 36 at 2, 7; Tr. 403, 405–06, and, second, the Junior Preferred Series did nothing to encourage retention of employees over the long term, because there was no requirement that Junior Preferred participants remain with AIG in order to receive their payout (so-called "golden handcuffs"), *see* ATX 36 at 7; Tr. 405–06, 2188. There was also apparently a risk that SICO, after having transferred away its insurance operations, would lack sufficient cash to pay the holders of Junior Preferred Series Six. *See* Tr. 2187.

The DCPPPs, as ultimately adopted, differed from the Junior Preferred Series in several ways. Each DCPPP spanned two years rather than five, *id.* at 208, and during this two-year period participants received cash payments, *id.* at 1592. At the end of the two years, participants were awarded shares of AIG stock (to be transferred from the Acquired Stock) if AIG's earnings had increased sufficiently during the DCPPP period. *Id.* at 981, 1592. The shares awarded to plan participants were set aside and awarded to them only upon their retirement, death, or disability. *Id.* at 208, 1591–92. The vast majority of participants in the DCPPPs were AIG employees—mostly AIG managers, *id.* at 1593—but employees of AIRCO (until it merged with AIG in 1978) and C.V. Starr also participated over the years, *id.* at 2072–73.

As noted, the DCPPPs were funded with Acquired Stock, *see id.* at 833, and SICO's Articles of Incorporation were amended to

allow the new plans to be established, an amendment that, per the requirements spelled out above, required the approval of the holder of SICO's Common Stock—i.e., the Charitable Trust, see STX BN. For each two-year plan, AIG managers made recommendations about which employees should be invited to participate in each DCPPP, Tr. 1596–97, but ultimately SICO's board of directors established the list of participants, see id. at 243, and the SICO Voting Shareholders approved it, see ATX 180; Tr. 503–04; Tr. Appx. B 21B–23B.

From 1975 through 2004, SICO provided a continuous series of two-year DCPPPs. See ATX 104; ATX 105; ATX 106; ATX 107; ATX 108; ATX 109; ATX 110; ATX 111; ATX 112; ATX 113; ATX 114; ATX 115; ATX 116; ATX 117; ATX 118. See also generally Tr. 2197–98. Participants in each DCPPP received a letter from SICO informing them that they had been granted a certain number of units in the plan. See, e.g., ATX 104. Beginning with the 1979–1980 plan, see ATX 106, these letters contained a recitation of the history of the 1970 reorganization, that noted, among other things, that

> [t]he voting shareholders of SICO, in an extraordinary decision, decided that [the value of the Acquired Stock] has been created through the outstanding performance on the part of two generations of American International people and it should not be used to enrich the then shareholders but instead preserved to provide incentives for succeeding generations.

ATX 106 at 1; ATX 107 at 1; ATX 108 at 1; ATX 109 at 1; ATX 110 at 1; ATX 111 at 1; ATX 112 at 1; ATX 113 at 1; ATX 114 at 1; ATX 115 at 1; ATX 116 at 1; ATX 117 at 1; ATX 118 at 1. All the letters also stated that inclusion in one DCPPP did not guarantee inclusion in any future Plan. See id. The DCPPP agreements similarly provided that inclusion in a given DCPPP did not confer on the participant any right to continue to be employed at the company or to participate in future plans, see Tr. 246–50, and they further provided that the Board of Directors of SICO, subject to the final approval of the majority of SICO's Voting Shareholders, had the power to amend the plans, id. at 245–46.

At the end of 2004 and continuing into the beginning of 2005, preparations were underway to institute the 2005–2006 DCPPP. Id. at 1605–06. On February 25, 2005, SICO's Board of Directors voted to approve the 2005–2006 DCPPP and the proposed list of participants and to pass the Plan and list along to SICO's Voting Shareholders for final approval. ATX 179; Tr. 501–02. On the same day, the Voting Shareholders approved the Plan and the list of participants. ATX 180; Tr. 503–04. Preparations were also made for a meeting of DCPPP participants in Orlando, Florida on May 6–8, 2005, at which Greenberg would make a presentation. Tr. 504–06; ATX 1776.

The 2005–2006 DCPPP was, however, ultimately cancelled by SICO. On March 14, 2005, Greenberg was forced to resign from his position as CEO of AIG.[8] Tr. 506.

---

8. Prior to trial, SICO moved to exclude all references to the governmental investigations that allegedly led (directly or indirectly) to Greenberg's termination as CEO and Chairman of AIG, and the Court granted its motion. See Tr. 13. But even if this proffered evidence, all of which was made known to the Court before and during the trial, had been received, and even if cross-examination of Mr.

Greenberg and other witnesses by AIG's counsel had established the various additional inferences (if any) that AIG's counsel claimed they would establish based on this excluded evidence, the Court now concludes that it would have made no difference whatever to the findings of fact and conclusions of law then reached by the jury and here reached by the Court. The only materially relevant facts

Two weeks later, on March 28, 2005, he also resigned his position as Chairman of the Board of AIG. *Id.* at 507. On the same day that Greenberg resigned as Chairman, a meeting of the SICO Voting Shareholders was held; only two of the Voting Shareholders, Michael Murphy and Ernest Stempel, were present in person, while the remaining ten participated by telephone. ATX 182. At the time, three of the Voting Shareholders—Robert Sandler, Thomas Tizzio, and Edmund Tse—were still employees of AIG. Tr. 514. At the March 28, 2009 meeting, the SICO Voting Shareholders unanimously voted to remove nine of SICO's Directors,[9] ATX 182, all of whom were employees of AIG or of an AIG subsidiary or affiliate at the time, *see* ATX 171; Tr. 518, 856; Tr. Appx. B 28B.

In early April 2005, Edward Matthews, at that time a director as well as a Voting Shareholder of SICO, *see* ATX 179 at 1; ATX 180 at 1, communicated to AIG that SICO did not expect to provide a DCPPP for 2005–2006 or any future DCPPPs, Tr. 608. (When SICO took this action, no letters or plan documents had been sent to those on the list of participants in the 2005–2006 DCPPP. Tr. 2437.) On May 24, 2005, the Voting Shareholders of SICO unanimously passed a resolution to rescind the actions taken in February approving the 2005–2006 DCPPP and "to agree that the Company should not provide any additional DCPPPs in the future with respect to AIG." ATX 1054 at 5. The Voting Shareholders also passed a resolution amending the Articles of Incorporation of SICO to remove references to an alternative contingency plan to the DCPPPS. ATX 1054 at 4.[10]

were that Greenberg was forced out and that it was a source of anger and bitterness that arguably affected the steps he then took regarding the DCPPPs and the Acquired Stock (as well as, arguably, his credibility on the stand)—facts of which the jury was made repeatedly aware and the Court has independently considered now.

9. The removed directors were William N. Dooley, Joseph C.H. Johnson, Donald Kanak, Kevin Kelley, Kristian P. Moor, Win J. Neuger, Martin J. Sullivan, Edmund Sze–Wing Tse, and Jay S. Wintrob. ATX 182.

10. The minutes of the May 24, 2005 meeting state that these actions were taken "in light of the fact that [SICO] and [AIG] mutually agreed that [SICO] will not provide any further [DCPPPs] to AIG employees after 2004." ATX 1054 at 4. The Court concludes that there was no adequate basis for this assertion of mutual agreement and that it was inserted at Greenberg's behest to try to camouflage acts he and his allies were taking to retaliate against AIG for what they regarded as his wrongful termination. At trial, moreover, Greenberg sought to rationalize this misstatement in the 2005 minutes by giving dubious testimony regarding the basis for his belief that there was a mutual agreement. He testified, for example, that "AIG publicly stated" that it did not wish to continue the DCPPPs,

Tr. 1002, but he was unable to identify any AIG public statement to this effect, *see id.* at 1005. He also testified that he had had a conversation with Robert Sandler on this topic, but he could not specify when. *Id.* at 1004, 1011. In the end, his only particularized testimony on this subject was his assertion that he had had a private conversation at the St. Regis Hotel in January 2005 with Richard Beattie (a lawyer appointed by the outside directors of AIG to investigate issues of corporate governance), at which Beattie told him, in effect, that it was unacceptable to continue an AIG deferred compensation program controlled by an outside company. Tr. 1032–33. Quite aside from the fact that this conversation, even if it occurred, was nothing like a mutual agreement, Beattie testified at trial that no such conversation ever took place, *id.* at 1710–11, and the Court fully credits Beattie's testimony and discredits Greenberg's testimony on this subject. The Court does not, however, draw from this finding the broader adverse inferences that AIG would have the Court draw. Although there never was the mutual agreement recited in the minutes, Greenberg correctly perceived that, once he and AIG were at war, AIG would never accept a compensation plan dictated by SICO, and this in fact was the view of AIG's senior management, *see* Tr. 2595–97, 2547–48. Greenberg, for his own purposes,

Although SICO cancelled the DCPPP program from 2005 forward, it fulfilled all obligations to participants in past DCPPPs. Indeed, on April 7, 2005, Matthews sent a letter to participants in past DCPPPs assuring them that shares set aside under past plans would not be touched. ATX 190. The letter read, "[t]he directors of SICO consider this obligation of SICO to the DCPPP participants a sacrosanct commitment made to all the participants and will honor it above all other obligations." *Id.* AIG does not allege that SICO failed to live up to this commitment.

On July 27, 2005, the Voting Shareholders of SICO adopted a new "Statement of Purpose" that "rescind[ed] any and all prior statements of purpose or similar documents previously adopted by [SICO] or its Voting Shareholders." ATX 195 at 3. Seeking to pour old wine into new bottles, the Statement of Purpose offers an account of the history of the 1970 reorganization and the DCPPP somewhat different in its points of emphasis from the account set forth in the 1970 Memorandum of Intent, the 1992 Statement of Commitment, and the numerous speeches Greenberg made over the years (discussed below). Where those documents and speeches emphasized that the legal structures put in place in 1970 were chiefly concerned with providing incentive compensation to future employees of AIG and other Starr-related entities, *see, e.g.,* ATX 5 at 2, as well as protecting AIG against a possible hostile takeover, *see, e.g.,* ATX 2 at 3–4, the 2005 Statement of Purpose states that "[o]ne of the principal long range objectives in 1970 was to build value for eventual long range use and distribution to the common stock owners for charitable purposes," ATX 98 at 1. While a very different "spin" from prior accounts, however, this new emphasis was not entirely without historical support, as evidenced, for example, by the creation of the Charitable Trust.

The 2005 Statement of Purpose then went on to emphasize that the decision in 1970 to provide incentive compensation to employees of AIRCO and AIG was "entirely discretionary on the part of the Voting Shareholders," *id.,* and was made because "the [V]oting [S]hareholders had determined that funding a deferred compensation plan would enable AIRCO and AIG to attract and retain exceptionally talented executives" who would contribute to the growth of AIRCO and AIG and, ultimately, "[enhance] the long-term value of [SICO's] direct financial stake in AIRCO, and its indirect stake in AIG," *id.* This was essentially consistent with prior accounts. Finally, the Statement explained that although in 1970, "the philosophies and economic incentives of [SICO], AIRCO and AIG were aligned," "[t]his is clearly no longer the case," *id.* at 2, which plainly was true. The Statement concludes by stating that SICO will exercise its "sole discretion" over its assets and "[chart] a new direction to be determined by [its] Board of Directors and Voting Shareholders consistent with [its] Articles of Incorporation and By-laws." *Id.*

On September 28, 2005, SICO's Board of Directors authorized the opening of an account at Bank of Bermuda to hold the Acquired Stock, ATX 196 at 4, and on the same day a majority of the Voting Shareholders instructed JP Morgan Chase to release the Acquired Stock and forward

then went ahead and mistakenly stated, at the May 24, 2005 meeting of SICO, that AIG and SICO had "mutually agreed" to end SICO's funding of the DCPPPs after 2004. At trial, Greenberg, unwilling to acknowledge this prior error, tried to justify it with vague statements and imagined conversations that, in the end, were unworthy of belief. This hardly redounds to Greenberg's credit, but neither does it justify the extended adverse inferences AIG would ask the Court to draw. It is more a molehill than a mountain.

the share certificates to SICO, ATX 197. The certificates were subsequently flown to Bermuda and placed in the account there. *See* Tr. 532. These actions were undertaken, in part, out of concern that AIG would attempt to attach the stock. *See id.* at 601–02.

In February of 2006, SICO began to sell AIG stock. *Id.* at 2659. SICO first sold AIG stock that was designated as "unrestricted" in SICO's financial records (i.e., not subject to the restrictions placed on the Acquired Stock), *see id.* at 2646–47, and then, in December 2006, once SICO had sold all of its "unrestricted" AIG stock, it began to sell the AIG shares that, according to its accounting, were classed as Acquired Stock, *see id.* at 2658, 2674. In total, SICO sold 96,910,978 shares of AIG stock for $4,276,889,269.89. ATX 1945 at 52; Tr. 2661. Of this total, approximately 74 million shares, worth approximately $2.9 billion, were designated Acquired Stock.[11] Tr. 2658. In May 2009, however, SICO began to purchase shares of AIG stock, so that it possessed, at the time of trial, the same number of "Acquired" or "restricted" shares—269 million—as it possessed in March 2005, when Greenberg left AIG. *Id.* at 2658–59.

### CONCLUSIONS OF LAW

■ Against this factual background, the Court now turns to AIG's breach-of-trust counterclaim, *i.e.*, the claim that SICO held the Acquired Stock in a trust of which AIG was the beneficiary and that SICO violated the terms of this trust by terminating the DCPPPs and/or by subsequently selling some of the Acquired Stock.

■ In order to create a valid trust under New York law (which both sides agree is applicable here), four "essential elements" are required:

> (1) a designated beneficiary, (2) a designated trustee, who is not the same person as the beneficiary, (3) a clearly identifiable res, and (4) the delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee.

*Agudas Chasidei Chabad of United States v. Gourary*, 833 F.2d 431, 434 (2d Cir. 1987).

■ The trust that AIG claims was created was an oral, or "express" trust. A trust need not be in writing to be valid, and "no particular form of words is necessary" to create one. *Id.* Indeed, "a trust may emerge by implication from the acts or words of the person creating it." *Id.* (quotation marks and citation omitted). However, in order to find that a trust has been created where there is no written declaration expressly creating a trust, the intent to create a trust must "aris[e] as a necessary inference from unequivocal evidence," *id.*

New York law in turn defines "unequivocal evidence" as "circumstances which show beyond reasonable doubt that a trust was intended to be created," *id.* (citing *Beaver v. Beaver*, 117 N.Y. 421, 428, 22 N.E. 940 (1889)). Despite this language, AIG contends that "unequivocal evidence" is more akin to "clear and convincing evidence." AIG's Proposed Jury Instructions at 21. While the Court disagrees with this contention, the dispute is irrelevant here, because the Court finds that under any

---

11. AIG contended at trial that SICO's designation of certain AIG stock as being part or not part of the Acquired Stock was simply an accounting fiction and that, for the purpose of calculating damages and/or equitable remedies such as disgorgement, all of the AIG stock that SICO sold from February 2006 forward should be considered Acquired Stock. *See* Tr. 2928–29. Because, however, the Court finds no liability, it does not reach this question.

heightened standard, whether "clear and convincing" or otherwise, AIG has failed to carry its burden of proving an intent to create the trust it claims was created.

Specifically, AIG argues that in 1970, AIG transferred the Acquired Stock to SICO with the intent that SICO would hold the stock in trust for the benefit of AIG. *See* Tr. 2847. By this account, then, AIG was both the settlor of the trust and its beneficiary.[12]

The first problem that this argument encounters is that the record of the 1970 transactions shows that legal title to the shares from which the Acquired Stock was ultimately derived first passed to AIRCO and then to SICO, and that it was the SICO Voting Shareholders who then segregated the portion that was designated as the Acquired Shares—so that AIG could not have been the settlor. In response, AIG argues that all of this is just an artificial formalism, given the overlapping control of AIG, SICO, and the other entities involved in the reorganization, and that, properly understood, the entire 1970 reorganization was superintended by and designed to benefit AIG. *See, e.g.,* Tr. 2868–69. Specifically, AIG argues that the chronology of the 1970 reorganization, viewed together with various statements and documents issued by AIG, shows that AIG was the prime mover behind the entire set of transactions and that, in orchestrating the reorganization, AIG ensured that incentive compensation be provided for its employees through SICO. Thus, AIG notes, on February 25, 1970, Greenberg announced—in his capacity as Presi-

dent of AIG—that AIG's board had met to consider acquiring substantially all of SICO's and C.V. Starr's insurance operations. STX CC at 379. Then, on March 4, 1970, Greenberg announced—again as AIG's President—that AIG's board of directors had approved this proposal. *Id.* at 381. AIG also stated, in the proxy statement for the reorganization, that "[t]he terms of the proposed acquisitions were determined by the Board of Directors of AIG," briefly explained the method of arriving at these terms (which included obtaining a fairness opinion from Morgan Stanley), and then noted, "[t]he terms as so established have been accepted by [SICO], AIRCO and Starr, subject, in the case of AIRCO, to approval by its shareholders." ATX 29 at 4.

AIG also relies upon a document entitled "AIG Acquisition of AI: Schedule of Meetings and Transactions," dated May 11, 1970, STX Z–6, that sets out the steps taken to accomplish the reorganization. This document indicates that after the March 4, 1970 approval of the proposed reorganization by AIG's Board of Directors, there was a May 14, 1970 meeting of the SICO Voting Shareholders at which they approved the "AIRCO–AIG exchange offer if made in terms set forth in AIG proxy statement" and also adopted the amendments to SICO's Articles of Incorporation that created the common stock and changed the terms for valuing the Junior Preferred Stock. *See* STX Z–6. AIG emphasizes that these amendments were presented to SICO's Voting Share-

---

12. The jury was instructed, without objection, that AIG had to show that it was the *sole* beneficiary. Tr. 3026. *See also* AIG's Proposed Findings of Fact and Conclusions of Law Regarding Its Trust Claim, Ex. C–2 to Proposed Pretrial Consent Order, at 105–08. Nevertheless, the Court, in an excess of caution and well beyond any argument clearly enunciated by AIG, has considered the possibility that a trust was created of which AIG was the immediate beneficiary (i.e. while SICO was in existence) but of which the Charitable Trust the ultimate beneficiary (i.e., if SICO dissolved) and finds that, there again, AIG has failed to carry its burden of proving the existence of such a trust, let alone that AIG created it.

holders before this meeting under cover of the May 12, 1970 explanatory memo from Duncan Lee, ATX 61, who was at that time General Counsel of AIG (as well as Vice President and Secretary), ATX 29 at 6.[13] Only after these steps were taken was the deal closed on June 30, 1970. *See* STX Z–6. According to AIG, these facts show that AIG orchestrated the restructuring of SICO so that SICO could become, going forward, a compensation vehicle for AIG employees.

These aspects of the 1970 reorganization are conceivably consistent with an intention, on AIG's part, to create a trust of which it was the beneficiary. But much more is required by the "unequivocal evidence" standard than that one possible interpretation of the evidence is that AIG intended that such a trust be created. Rather, the "unequivocal evidence" standard, as interpreted by the New York courts and the Second Circuit, requires in the instant context that, while there may be contrary evidence, overall the facts must admit of no reasonable interpretation other than that AIG intended to create a trust. *See Agudas*, 833 F.2d at 434. Indeed, even under a "clear and convincing" standard, which AIG argues (erroneously, in the Court's view) may be applied here, the proof that AIG intended to create the trust must be "highly probable" or "reasonably certain," *see, e.g., People v. Stewart*, 61 A.D.3d 1059, 1060, 876 N.Y.S.2d 208 (3d Dep't 2009); *United States v. Goba*, 220 F.Supp.2d 182, 189 (W.D.N.Y.2002) (citing Black's Law Dictionary (7th ed.1999)). Yet the most that AIG has shown in this regard, the Court finds, is that this is a conceivable reading of the available evidence, and not even the more likely one.

■ This is particularly evident when one remembers that the essence of an express trust is that it is clearly expressed: that is, the intent to create the trust must be plainly and objectively manifested, so that the inference that it was created is a necessary one, not just a plausible possibility. *See Agudas*, 833 F.2d at 434; *Del Drago v. Comm'r of Internal Revenue*, 214 F.2d 478, 480 (2d Cir.1954). In the instant context, it is unclear how AIG, a public company that can act only through appropriate formalities, could be understood to have an intent to create a trust if that intent is nowhere memorialized in the proceedings of AIG's board of directors. Yet nowhere in evidence here is there a statement or document issued by AIG or its Board either stating or necessarily implying that AIG intended that the shares it caused to be transferred to SICO in 1970 be placed in trust.

Moreover, it was SICO, not AIG, that took many of the requisite actions that governed the use of the Acquired Stock. It was SICO, not AIG, that amended its Articles of Incorporation to set aside the Acquired Stock and SICO that memorialized its intentions in this regard when the Voting Shareholders signed the 1970 Memorandum of Intent. And the record abounds with statements by SICO—in, for example, the 1992 Statement of Commitment, ATX 5 at 2, and in the letters announcing each DCPPP plan, *see, e.g.,* ATX 106 at 1—that the decision to set aside the Acquired Stock to be used to fund incentive compensation (until such time as there was dissolution and the assets went to the Charitable Trust) was a decision made by the SICO Voting Shareholders, who otherwise, as the controlling shareholders of

---

**13.** As noted above, however, he was also Vice President, Secretary, and General Counsel of C.V. Starr. ATX 29 at 6. AIG's claim that Lee spoke for AIG in this memorandum is further thrown into doubt by the fact that it is written on the letterhead of Lee, McCarthy & DeRosa, which was counsel for SICO and AIRCO during the 1970 reorganization. *Id.* at 53.

SICO and as substantial holders of the SICO Junior Preferred Stock, could have taken most of the $130 million value of the AIG stock for their own benefit, *see* ATX 2 at 4. Indeed, many of *AIG's* own public filings, including recent Forms 10–K filed with the Securities and Exchange Commission, *see, e.g.,* STX HD–33; STX HD–34, and a 2002 proxy statement, STX HG–30, state that "[t]he SICO plan [i.e., the DCPPP Plan] came into being in 1975 when the voting shareholders and Board of Directors of SICO ... decided that a portion of the capital value of SICO should be used to provide an incentive plan for the current and succeeding managements of all American International companies, including AIG." By all of these accounts, it was SICO, not AIG, that determined what would be done with the Acquired Stock.

Viewed in its entirety, then, the evidence simply does not show by any standard, let alone by unequivocal evidence, that in 1970 AIG intended to create or believed it was creating the trust it now alleges it created.

Nor, even under a preponderance of the evidence standard—which applies to the essential elements of an express trust other than the intent to create the trust, *see* Tr. 3022—does the evidence show that any trust of the kind for which AIG now argues existed from 1970 going forward.

To begin with, it is noteworthy in this regard that the trust that AIG posits was never memorialized in writing. While it is true that a writing is not required to create a trust, *Agudas*, 833 F.2d at 434, that does not mean that the absence of a writing in this context does not have evidentiary weight. It borders on the incredible that a public company would commit shares representing approximately one fourth of its total market capitalization to a trust of which it is the sole beneficiary without the slightest documentation of this fact. In contrast, the much less immediately relevant Charitable Trust and the "companion trust" at C.V. Starr were both memorialized in trust documents. STX D; STX E.[14]

Even more damning is the fact that AIG produced no witnesses who testified that a trust in favor of AIG existed. On the contrary, every witness familiar with the 1970 reorganization, AIG's compensation programs, or SICO or AIG's finances who was asked about the existence of such a trust denied any knowledge of one.

This includes, for example, AIG's independent directors. Carla Hills, who was an independent director of AIG from 1993 to 2006 and who served on AIG's audit committee, Tr. 1192, testified that to her knowledge AIG had no ownership interest in SICO's AIG stock and that during her 13 years on AIG's board, no one ever told her that a trust in favor of AIG existed at SICO, *id.* at 1201. Dean Phypers, who served as an independent director of AIG from 1979–2000, *id.* at 2369–70, and who sat on AIG's audit committee for much of that time, *id.* at 2371, testified that he did not recall that Freeman, Manton, Stempel, Greenberg, Roberts, Aidinoff, or Matthews, all of whom he worked with as members of AIG's board of directors, *id.* at 2380, ever stated that any of SICO's AIG shares were held in trust for the benefit of AIG, *id.* at 2382. Frank Zarb, another outside director of AIG from 2001 to 2008, *id.* at 1508, who also served on AIG's audit committee, *id.* at 1509–10, testified that apart from the claims asserted by AIG in this case and what counsel had told him, he was not aware of anyone

---

14. It is true that the formal documents evidencing the C.V. Starr & Co. Inc. Trust agreement were not executed until 1977, but the fact remains that they were still executed within a few years of the creation of the trust, whereas the vastly bigger Acquired Stock "trust" allegedly created in 1970 by AIG was never reduced to writing at all.

asserting that SICO had a legal obligation to continue to fund the DCPPPs, *id.* at 1555.

This also includes AIG's counsel. Bernard Aidinoff, who was counsel for AIG at the time of the 1970 reorganization and served as a director of the company from 1984 to 2006, *id.* at 2589, testified that although it was understood that the Acquired Stock would be used to fund the DCPPPs over the years, he knew of no contract or agreement as such between SICO and AIG that obligated SICO to continue the DCPPPs, *id.* at 2599. Ernest Patrikis, who was Senior Vice President and General Counsel of AIG from 1999 to 2006, *id.* at 1882–82, testified that before Greenberg resigned as Chairman and CEO of AIG, he had never heard anyone assert that a trust (apart from the Charitable Trust) controlled any of SICO's AIG shares, *id.* at 1911–12.[15]

This also includes AIG's auditors. Anthony Colao, a partner at Coopers & Lybrand who was responsible for auditing AIG from 1980–1986, *id.* at 1929–30, testified that he did not recall ever having been told of a trust or agreement between AIG and SICO concerning how SICO would use any of its AIG shares, *id.* at 1936.[16] Richard Mayock, a partner at Pricewaterhouse-Coopers ("PwC") who worked as an auditor of AIG for seven years ending in 2004, *id.* at 1957–58, testified that he never saw any document authored by AIG and produced to PwC that indicated that there was an agreement or contract between SICO and AIG concerning how SICO would use the Acquired Shares, nor, to his

knowledge, did any AIG person ever orally inform any PwC person that there was such an agreement, *id.* at 1976–77.

And it includes AIG executives. R. Kendall Nottingham, who became Executive Vice President of AIG in 1998 and a Director of SICO in 2003, testified that he had no knowledge of an agreement that obligated SICO to use the Acquired Stock to fund deferred compensation for AIG employees and that he was never made aware of any trust pursuant to which the Acquired Shares were being held by SICO for the benefit of AIG or AIG employees. *Id.* at 1762–63. Finally, Martin Sullivan, who replaced Greenberg as CEO of AIG in March 2005, *id.* at 1011, and so was AIG's chief executive at the time SICO terminated the DCPPPs, testified that he never heard anyone say that there was an agreement or understanding between SICO and AIG as to how the AIG shares held by SICO would be used, *id.* at 2733.

While it is conceivable that one or more of these individuals could simply have been ignorant of the existence of the trust that AIG alleges, taken cumulatively, their testimony indicates, rather overwhelmingly, that there was no such trust. Moreover, despite years of discovery, AIG, which has the burden to prove the trust, was unable to call a single AIG executive, director, auditor, lawyer, or employee to testify to the existence of such a trust.

Nor was there any reference to a trust of which SICO was the trustee and AIG was the beneficiary in any of the many public filings and audited statements is-

---

**15.** Patrikis did state that "the words trust, held in trust, were used," Tr. 1912, but his testimony makes clear that he did not understand the invocation of these words to amount to an assertion that a trust controlled the Acquired Stock.

**16.** To be sure, Colao's testimony generally indicated that he did not have a strong recol-

lection of the details of the relationship between SICO and AIG, *see* Tr. 1936–37, and taken alone it would not be dispositive; but he represents yet another individual with no recollection or understanding that a trust existed, and the combination of all this testimony is unrebutted by any contrary testimony offered by AIG.

sued by AIG over the decades. On the contrary, SICO introduced evidence showing that on a numerous occasions in various contexts, AIG and its auditors stated that SICO and/or the Charitable Trust was the "beneficial owner" or the "primary beneficiary" of the Acquired Stock. For example, in a filing made with the Federal Office of Thrift Supervision, AIG stated that "SICO beneficially owns approximately 13.7% of the outstanding common stock of AIG." STX JD at 3. In a February 2002 letter to PwC, AIG stated that "[t]he beneficial owner of the AIG shares held by [SICO] is a charitable trust." STX I at 13. In a March 2005 memorandum, PwC concluded that the Charitable Trust was SICO's "presumptive PB [primary beneficiary]" for purposes of Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"). STX A at 9.

AIG argued that in some or all of these instances, the terms "beneficial ownership" and "primary beneficiary" were intended to have the specialized meanings ascribed to them in the context of the securities laws, see 17 C.F.R. § 240.13d–3(a), or accounting rules, see FIN 46R. The Court agrees that in certain of these instances these terms did carry specialized meanings—for example, the discussion of "primary beneficiary" in PwC's March 2005 memorandum, STX A—and that no one localized use of either term settles the dispute over whether the alleged trust existed. At the same time, a document such as the 2005 PwC memorandum purports to offer a detailed overview of the relationship between AIG and SICO. It states, in the context of addressing whether there is a principal-agency relationship between the two companies, that "[s]ubstantially all the assets of SICO are beneficially owned by the [Charitable] Trust, administered by an independent trustee; at the present time and within the foreseeable future, the benefits of those assets will ultimately inure to parties unrelated to AIG." Id. at 13.

This statement cannot be reconciled with the trust alleged by AIG; indeed, the 2005 PwC memorandum and the other documents are, if anything, supportive of SICO's contention that objective of ultimately donating the bulk of the Acquired Shares to charity was not a mere afterthought. And whatever the specialized meaning given to certain of the terms used in these documents, it is completely implausible to suggest that if AIG, a public company, were the beneficiary of an express trust containing assets worth, at their peak, over $20 billion, see STX EH at 2, some statement to this effect would not be set forth somewhere in AIG's audited statements and public filings.

The best that AIG offers to rebut this point, see Tr. 2925, is the argument that the real nature of the alleged trust was purposely obscured or concealed by Greenberg, because he did not wish to record the transfers and payments made pursuant to the DCPPPs as expenses of AIG. Several witnesses did testify that Greenberg had stated that if AIG were required to expense the DCPPPs, SICO would end the program. See Tr. 2597 (testimony of Aidinoff); Tr. 1909 (testimony of Patrikis); Tr. 1967–68 (testimony of Winograd); Tr. 2389 (testimony of Phypers). And in 2005, in the wake of Greenberg's departure, AIG issued a restated 2004 Form 10–K (the "Restatement"), STX HD–36, that now expensed the plans (and recorded a corresponding increase in paid-in capital). The Restatement included the following language:

> The amount of deferred compensation granted by SICO has previously been disclosed in the notes to AIG's consolidated statements but was not included in the calculation of AIG's consolidated net income because the amounts had been determined not to be material to

AIG's consolidated results of operations in any individual period.[17]

STX HD–36 at 41. The Restatement, however, does not indicate that there had previously been inadequate disclosure regarding the DCPPPs—nor does it anywhere refer to a previously undisclosed trust. Moreover, the Restatement elsewhere offers substantially the same account of the origins of the DCPPP Plan as that given by SICO here:

> [t]he original SICO Plan came into being in 1975 when the voting shareholders and Board of Directors of SICO ... decided that a portion of the capital value of SICO should be used to provide an incentive plan for the current and succeeding management of all American International companies, including AIG.

*Id.* at 205–06. In this account, espoused by AIG, post-Greenberg, even as it discussed, a few sentences later, the fact that SICO would not provide future plans, *id.* at 206, AIG makes no reference to a trust, nor does it dispute that the decision to create the DCPPPs was made by SICO.

Nor was the parties' conduct over the 35–year period from 1970 to 2005 consistent with the existence of the trust that AIG now alleges existed during all those years. In argument at trial, AIG stressed that the Acquired Stock was used during this entire period to provide an uninterrupted series of incentive compensation programs for AIG employees, conduct that, it claims, is evidence of an obligation to do so on SICO's part. *See, e.g.,* Tr. 119, 2850, 2901, 2926. But while it is true that SICO used the Acquired Stock to fund compensation plans for this entire period, AIG employees were not the only persons to benefit from the Acquired Stock during this time.[18] As noted above, for example, participants in both the Junior Preferred Series Six plan and in subsequent DCPPPs included not only AIG employees but employees of C.V. Starr and AIRCO as well. In addition, SICO (without protest from AIG) received dividends on the Acquired Stock that were treated as unrestricted assets. Tr. 2112–13, 2592. These facts indicate that AIG was not the sole beneficiary of the shares; other parties, including SICO itself as well as employees of C.V. Starr and AIRCO, received economic benefit from the Acquired Shares.

---

**17.** The evidence, however, concerning the real reason or reasons that AIG did not expense the plans prior to 2005 is not entirely consistent. There was testimony, for example, that the reason was that SICO's assets, not AIG's, were used to fund the plans. Tr. 2389. It is also the case that in 2004, an accounting change was announced (Financial Accounting Standards Board Statement 123R) under which, in the view of PwC and AIG management, it became necessary to expense the plans. *See id.* at 1910–11, 1954, 1956.

**18.** SICO argued, in support of its Rule 52(c) and Rule 50(a) motion, that the fact that AIG itself (as opposed to its employees) never directly received any income or principal from the trust is inconsistent with the existence of a trust of which AIG is the sole beneficiary. Memorandum of Law in Support of Motion by Starr International Company, Inc. for Judgment on Partial Findings Pursuant to Fed.R.Civ.P. 52(c) and Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(a) at 21–22. SICO also argued that AIG's failure to establish the specific terms of the trust makes it impossible to determine which, if any, of SICO's actions breached the alleged trust. *Id.* at 27–29. These arguments are not without some weight. For example, was SICO obligated provide DCPPPS or simply to use the shares to benefit AIG in some way? If the former was the case, how was it consistent with this trust for SICO to retain the right to waive or alter the individual DCPPPs, as it unquestionably did? If the latter, was SICO's termination of the DCPPPs in fact a breach of the trust, or did a breach only occur later, when SICO sold some of the Acquired Shares? But again, the Court need not reach these questions since it finds, on other grounds, that AIG has wholly failed to prove the existence of the trust it here posits.

*See Schoellkopf v. Marine Trust Co. of Buffalo,* 267 N.Y. 358, 362, 196 N.E. 288 (1935) ("Any person who under the terms of the instrument has a right, whether present or future, whether vested or contingent, to income or principal of the trust fund, has a beneficial interest in the trust."). Nor did AIG, prior to 2005, ever voice any objection to this state of affairs.

So strong is the evidence against the existence of the trust here posited by AIG that SICO's counsel even argued at trial that it was simply a concoction of AIG's counsel, devised in response to SICO's initiation of the instant lawsuit. *See, e.g.,* Tr. 2957–62. But this is not entirely fair, because Greenberg himself, in speech after speech during the years prior to 2005, referred to the DCPPPs as a kind of "trust." Most of these statements were made in the course of speeches given to participants in the DCPPPs, the first of which took place on January 31, 1989, *see* ATX 2. The ostensible purpose of that speech was to explain the history and policy of the DCPPPs (participation in which had also come to be known as, simply, participating in "SICO," *see* ATX 2 at 2; Tr. 201). Greenberg explained that at the time of the 1970 reorganization,

> [t]he then shareholders of [SICO and C.V. Starr] . . . , we had the right, at that time, since we owned the shares in the company, to keep all the shares that were then being exchanged for [SICO] but what we did instead was simply take the book value and the difference between the book value and the market value was put into a company called SICO where we set up a trust.
>
> We said we're going to put these shares in trust. Those shares, that was I might say probably the most unselfish act in corporate history in the United States . . . . We put these shares in a trust, in SICO, and that we wanted to do for two things. We wanted to have that trust

control AIG so that we would not be vulnerable at any time in the future . . . .

> At the same time we said we wanted an incentive for on-going management, an incentive that they could share in the success of the company as it grows and some of the rewards ought to be—a formula should be devised that would do this. So what we set up was a mechanism under which shares in the trust come out of the trust to the shareholders based upon the performance of AIG . . . .
>
> We put in a couple of caveats in not knowing how future generations would behave. We said in the trust agreement that if any group of managers of SICO in the future, who-ever they may be, decided to liquidate the plan and keep all these assets for themselves, the moment they tried to do so that the assets would go to the Starr Foundation. So there's no incentive for anybody to rob the nest . . . .

ATX 2 at 2–6.

At a similar meeting held in New York on July 24, 1996, *see* Tr. 221–23, Greenberg stated,

> When we did [the 1970] restructuring, of course, we turned in the shares we owned in the private companies.
>
> And we were entitled to, of course, the AIG shares in return. But we made a decision, at the time, that we would only take the book value and all the difference between book value and the market value was put into a trust. Even though we were entitled to the ownership that we were exchanging for the shares that were being exchanged, we felt that since this value had been built up over the years, no single group was entitled to take the benefits of that.
>
> That culture that we had and the ethics, and the commitment in the company— That amount I should tell you, is about 120 million dollars, which was, and is a

considerable amount of money that went into that trust. All of us stood aside and said this is something we want to do. And we wanted to use that in a plan that would provide for incentives to future generations of managers in the AIG companies, based upon a formula, as to how AIG, itself, did . . . .

That little so-called 120 million dollar amount of funds that we stepped aside from has turned out now, to be worth billions of dollars in the SICO plan, in the trust account. I should tell you, that trust account is set up so that no one group of individuals can ever raid it. It's there only, it's there for two purposes. One to be a major shareholder in AIG shares that make up this trust, so that we would have independence and not be, not fear a hostile takeover . . . . And second, to have this plan, that I described, that would pay out to the participants, based upon their participations in SICO . . . .

It was, when it was set up, it was designed that we would give you these participations and they'd be held in trust for you. And when you retired, then those shares were made available at no cost.

ATX 3 at 3–5.

At a meeting on November 29, 2000, Greenberg spoke once again to DCPPP participants and made references to a kind of trust:

[At the time of the 1970 reorganization,] we had a right to all the, all of the shares that were exchanged, which was AIG shares.

But we chose not to do that. We chose to take the book value of the transaction and put the difference between book value and market value into a trust for the benefit going forward of ongoing managers and participants that we

hoped, we built a plan for. That difference, at the time, was about a 120 million dollars, roughly . . . .

So we really gave up uh, all of the benefits, all of us at the time, for that because we believed that it would be important to preserve the corpus for the future . . . . We chose to put these funds, uh, in the trust.

Now that trust accounts for, today, roughly I think, about 18% of AIG's share, shares outstanding. So it becomes a, became a control mechanism . . . .

And when we first put it together, uh, we had very little shares dribble out of the, of the share, of the blocked account. We put these shares in a trust and that trust cannot be broken by anybody; any future managements cannot break that trust. If they did, the shares would automatically go to the Starr Foundation. So there's no incentive for anybody to raid the cookie jar.

We thought about all possibilities going forward and we developed a plan so that we believed it could stay in place and have sufficient shares in the trust for a couple of hundred years. In other words, we were trying to preserve, as much as we could, for ongoing management incentives, for the future. And, I, and we really believe this could happen because in the 25 years or so that, that the plan has been in effect, only about 7% of the trust of the shares in trust have been uh, have been put aside for individual accounts. And so there's, we know it's going to go on for a very long period of time.

ATX 1 at 3–6.

Finally, at a meeting of SICO participants in Orlando, Florida on May 4–5, 2001, Greenberg again gave his version of the history of the DCPPP program: [19]

**19.** While the first three speeches were transcribed, no transcript exists of the 2001 speech. Instead, there is a prepared script

When we went public, the [Voting Shareholders of SICO] were all entitled to the financial benefits since they were the shareholders of the private company[.] But rather than take all these benefits, we decided that we should only take the book value, and the difference between book value and market value were [sic] placed in a newly created company named SICO . . . .

We placed those shares in trust and developed an incentive plan that would permit shares to be taken from the trust to a shareholder account based on the performance of AIG for a two year period . . . .

ATX 4 at 5–7.

In addition to these speeches, Greenberg made similar statements concerning the history of SICO and the Acquired Shares in a letter written in 1998 to *Fortune* magazine writer Carol Loomis and during the course of a 1995 interview with Walter Guzzardi, a journalist who was writing a book about the history of AIG. Loomis had written an article about AIG, *see* ATX 69 at 1, and Greenberg wrote to give her the "full history and background" of SICO because he felt her article gave a "misleading impression" of the company, *id.* He explained,

SICO was created in its present form in 1970 when [American International Underwriters'] worldwide insurance agencies were acquired by AIG in exchange for what is now AIG common stock. At that time, the voting shareholders of SICO, in what I believe to be an unprecedented act in U.S. business history, decided that these shares of AIG . . . should not be used to enrich the then shareholders of SICO, but should instead be held by them as fiduciaries for future generations of AIG management.

which the parties stipulated is an accurate record of the substance of what Greenberg

*Id.* And during the Guzzardi interview, Greenberg gave yet another recitation of his stock story:

it was an act beyond that from the senior people of great vision and I think unselfishness in that we all gave up the difference between the book value and the market value when we made the exchange . . . . [W]e were entitled to all of the AIG shares of the stock that we held.

But instead, I proposed that the only thing we should take is the book value. And the difference between book value and the market value should go into these trusts, into these companies, for future generations, . . . we were not entitled to what others had done before that we were benefiting from. So we put it in these trusts.

ATX 26 at 7.

The Court has quoted these statements at length to refute any notion that AIG's trust theory was wholly a *post hoc* concoction, devoid of any ostensible support. However, what these remarks actually show, the Court finds, is not that the trust AIG now posits actually existed—even on their face, Greenberg's remarks refer only to a trust created by SICO, and, in any event, the contrary evidence already summarized above fully refutes AIG's claim— but rather Greenberg's penchant for hyperbole and his tendency to convince himself that the "spin" he was placing on the historical record at any given moment was what actually occurred.

This explains, in the Court's view, why Greenberg used the word "trust" in reference to the Acquired Shares during the course of a July 16, 2003 interview with attorneys from the law firm of Weil,

said in the speech. Tr. 233–34.

Gotshal & Manges LLP ("Weil Gotshal"). At the time, Weil Gotshal represented a special litigation committee comprised of outside directors of AIG. *See* Tr. 1720. The interview was attended by members of this committee as well as numerous lawyers. *Id.* at 1720–21. Two attorneys for Weil Gotshal, Stephen Radin and Bradley Aronstam, took handwritten notes during the interview, portions of which were read into the record. Radin's notes reflect that Greenberg discussed the transfer of shares to C.V. Starr and SICO during the 1970 reorganization and said that the shareholders of the two private companies decided not to take the value of the shares for themselves. *See* Tr. 1722. The notes then record a reference to "C. V. Starr's trust, SICO is trust." *Id.* The notes further read, "INC., [incentive compensation] So set up SICO." *Id.* (brackets in original). Aronstam's notes, in turn, read

> Made decision not entitled to take all value of exchange itself. Look out for future generation. Took book value. Rest went into C.V. Starr and SICO in a trust. Most generous thing done in. America, American history of corporate governance.
> LTI [long-term incentive] program. AIG small Co. [company] Couldn't pay a lot of salaries and incentives. Put book value, put rest in trust. SHs [shareholders] benefit by efforts of folks in dic [sic]
> Clear on its face, Starr and SICO benefit AIG. [AIG's shareholders] [don't] have to pay for compensation . . . .

Tr. 1723 (brackets in original).

Thus, to the extent that it is possible to reconstruct Greenberg's statements from these notes, the notes reflect that at this interview Greenberg went over his familiar talking points on the subject of the 1970 reorganization. AIG argued at trial that this refuted Greenberg's claims on the stand that his references to trusts in his earlier speeches to the DCPPP participants were simply part of the rhetoric of motivational talks that no one took literally. *See, e.g.,* Tr. 953–54 (Greenberg testimony); Tr. 2913–14 (AIG argument). The Court agrees with AIG that Greenberg's attempt on the stand to discount his prior statements as pure rhetoric is unpersuasive. But it does not agree with AIG that the statements themselves are powerful evidence of the existence of the trust AIG posits.

To begin with, in none of these statements, no matter who the audience, does Greenberg specifically refer to a trust of which AIG was either the settlor or the sole beneficiary. The closest he comes to the latter is to say that the Acquired Stock was put "into a trust for the benefit going forward of ongoing managers and participants," ATX 1 at 3, and to say that it was held by the shareholders of SICO "as fiduciaries for future generations of AIG management," ATX 69 at 1–in other words, that the shares were held in trust for the benefit of employees of AIG. But the majority of his references to a "trust" take the form of generic assertions that the Acquired Stock was placed "in trust," *see, e.g.,* ATX 2 at 3, or "in a trust," *see, e.g.,* ATX 1 at 5, at SICO. Moreover, as each of his various audiences undoubtedly understood, what Greenberg was emphasizing, in all these contexts, was not his view of the legalistic niceties of the DCPPP plans, but rather his view that he and the other SICO Voting Shareholders had acted in an altruistic manner for their benefit. Whether his audience was AIG, the media, or investigative lawyers, his intent was to try to show that he was a "good guy."

Here, as elsewhere, Greenberg's descriptions of the legal arrangements underpinning the relationships among the Starr companies are not entitled to significant weight. His testimony shows that his

understanding of these arrangements tends to be general rather than particularized. He has often been called upon, over the years, to describe certain transactions and legal relationships, and when doing so he appears to resort to certain stock phrases and rehearsed stories that are at best oversimplifications and may, on occasion, be downright erroneous, a substitution of what he would like to believe for what actually happened.

To take a prominent example, Greenberg stated repeatedly over the years, in public, in private, and again at trial, that the arrangements that he and the other SICO Voting Shareholders had made in 1970 provided that if some SICO shareholder or group of shareholders attempted to take SICO's Acquired Stock for their own benefit—to, as he put it, "rob the nest," ATX 2 at 6, or "raid the cookie jar," ATX 1 at 5—all of the Acquired Stock would automatically go to the Starr Foundation, *see* ATX 1 at 5; ATX 2 at 6. He made this statement to, among many others, participants in the DCPPPs, *id.*, AIG directors such as Carla Hills, Tr. 1209–10, journalists such as Walter Guzzardi, ATX 26 at 8, and, repeatedly, the judge and jury in this very trial. *See, e.g.,* Tr. 377, 421, 428, 905, 973, 1099–1100, 1110–11. When pressed to identify a legal document containing such a provision, however, Greenberg could point only, *see* Tr. 1309–15, to a section of the trust agreement establishing the Charitable Trust that reads,

> In the event that for any reason the Trust hereby created shall terminate according to the terms hereof or shall be declared void, or its charitable purposes found to be frustrated, by a Court of competent jurisdiction then the entire Trust Fund shall be transferred unconditionally to the Starr Foundation, Inc.

STX D at 5. The language of this provision only obliquely, if at all, supports the proposition that if any of the Voting Shareholders of SICO attempted to "raid the cookie jar," the Acquired Stock would automatically go to the Starr Foundation. When questioned more closely about the import of this provision, Greenberg maintained, "I'm not a trust lawyer. I read that to mean that if any part of the stock that was being held in the trust was taken improperly, it would go to the Starr Foundation," Tr. 1310.

Greenberg's persistent but essentially unsupported belief that the Starr Foundation would automatically receive the Acquired Shares in the event of attempted self-dealing by SICO Shareholders appears to be wholly genuine, and it demonstrates that Greenberg's understanding and accounts of the niceties of the legal structures and arrangements of AIG, SICO and their sister companies are far from precise. His references to a "trust" in speeches and documents over the years were, the Court finds, similarly imprecise and are more readily understood as references to the legal arrangements that are extensively documented—the Acquired Stock set aside as "restricted," with the Charitable Trust owning all of the SICO's common stock—than as references to a trust that is nowhere documented. In short, Greenberg's various references to a trust—unsupported by the underlying documents and not relied upon by their listeners as a precise statement of legal arrangements—do not materially support the conclusion that the Acquired Shares were held in trust for AIG or its employees. *Cf. Caballero v. Anselmo,* 720 F.Supp. 1088, 1096 (S.D.N.Y.1989) ("The intent to create a trust and even the use of the word 'trust' do not compel the finding that a trust has been created.").

AIG also points to a February 26, 2004 letter from Mary Walsh of PwC to Ireland's tax authorities, ATX 20. This letter

addressed the question of whether SICO was a "close corporation" for the purposes of Irish tax law. It describes the structure of SICO, the DCPPP program, and the "essential philosophy" behind it of providing long-term compensation "to current and future generations" of management in order to retain key employees and encourage growth. *Id.* at 2. It then states,

> [t]o meet its aim, the structure of SICO had to ensure that there was no control of the company by any one person or small group of persons for their own benefit or the benefit of one generation of AIG employees. The SICO voting shareholders are effectively a trustee mechanism to permit the incentive plan to carry on for many generations.

*Id.* at 3. And later, it states,

> [t]he twelve individuals holding the voting shares in SICO do so in a trustee/custodian role to ensure that the group's policies and obligations under the shares plans are satisfied and that much of its value remains available for future generations as provided in the charter of the company.
>
> . . .
>
> The real result of the structure is that the SICO shares (and in turn the AIG shares held by SICO) are being held for the ultimate benefit of the current and future global employees of AIG who in time will receive the AIG shares personally. This pool of current participants who are AIG employees would amount to approximately 750, but it is envisaged that the shares will be used over an extremely long timeframe (over a hundred years) for this purpose, so many generations of future employees will be involved.

*Id.* at 8. Even in this document, however, it is not asserted that a trust in favor of AIG existed. Rather, PwC's language—a "trustee mechanism," "the real result of the structure"—describes legal arrangements that, overall, have similar effects to a trust.

To be sure, the unique set of legal arrangements that accompanied the reorganization of the Starr companies in 1970 had some trust-like aspects, but none that constituted the particular trust here posited by AIG. There were formal steps put in place to safeguard the Acquired Stock, but they were put in place by SICO and with the express provision that, upon SICO's dissolution, they would go the Charitable Trust. There was also the expectation, though hardly a guarantee, that they would be used to provide long-term incentive compensation to employees of AIG, but also to employees of other Starr-related companies for the foreseeable future. This set of legal arrangements included the creation of the Charitable Trust and the sale of SICO's common stock to it for nominal consideration, the amendment of SICO's Articles of Incorporation so that the Charitable Trust would receive the value of the company in the event that it was dissolved; and the amendment of SICO's Articles of Incorporation so that the holders of the Junior Preferred Stock did not receive the value of the 1970 sale of SICO's assets. It also included the additional protections that were put in place in SICO's amended Articles of Incorporation to prevent any attempt by future managers to take the Acquired Stock for themselves, in particular, the prohibitions against changing the definition of Acquired Stock without the consent of the Common Stockholder (i.e., the Charitable Trust), the restriction against using Acquired Stock to pay dividends on the Junior Preferred series, and the provision stating that all of SICO's assets go to the Common Stockholder upon the company's dissolution.

By contrast, the legal arrangements put in place in 1970 did not include any trust of which AIG itself was both the settlor and the beneficiary, SICO the trustee, and the

Acquired Stock the trust res. Nor, as detailed above, was there any other manifestation, oral or written, that meaningfully implied the creation of such a trust.

It is clear that in 2005, SICO changed course. This change is reflected not only in the termination of the DCPPPs but also in such actions as the adoption the 2005 Statement of Purpose. But to the extent that SICO's change of course ran afoul of any affirmative legal obligation to any party—and the Court does not remotely suggest that it did—the various mechanisms put in place to safeguard the Acquired Stock did not include giving AIG the legal right, as beneficiary of a trust, to compel SICO to continue the DCPPPs or to otherwise use the Acquired Stock for AIG's benefit.

The Court has carefully considered all of AIG's other arguments and finds them to be without merit. Accordingly, the Court finds that AIG has failed to prove SICO's liability on AIG's counterclaim for breach of an express trust.[20]

### SICO'S COUNTERCLAIM

As noted above, in October 2005 SICO filed a counterclaim seeking a declaratory judgment that AIG is not a controlling person or affiliate of SICO under the federal securities laws. At the start of trial, the parties agreed that this counterclaim would be severed, and the parties waived their right to a jury trial on this claim. After the trial had concluded, AIG moved to dismiss SICO's counterclaim on the ground that it is not justiciable.[21] The Court received full briefing on this motion from the parties and heard oral argument on July 29, 2009. For the reasons set forth below, the Court hereby grants AIG's motion to dismiss SICO's counterclaim, but without prejudice.

SICO holds a substantial block of AIG shares that bear restrictions on their transfer under the federal securities laws (entirely apart from the private restrictions placed on the Acquired Stock by SICO itself). Under Rule 144 of the Securities & Exchange Commission ("SEC"), a holder of certain restricted securities—including, as here, securities acquired by private sale from the issuer, 17 C.F.R. § 230.144(a)(3)—becomes exempt from some of the restrictions on the transfer of those securities if 1) it is not an affiliate of the issuer, and 2) it has held the securities for at least one year.[22] SICO maintains that it is not an affiliate of AIG for the purposes of Rule 144,[23] and it alleges that AIG has inaccurately listed SICO as an affiliate and/or controlling person of AIG on certain Schedules 13D that AIG has

---

**20.** At trial, AIG also maintained that, independent of its breach-of-trust counterclaim, the same counterclaim also stated a cause of action for some other putative breach of fiduciary duty. This alternative theory was dismissed by the Court at the time of the charging conference on jury instructions, and the Court hereby reconfirms that dismissal for the reasons previously stated. See Tr. 3033–37.

**21.** AIG brings this motion as a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c), as is appropriate when a motion to dismiss based on a non-waivable defense is brought after the close of pleadings. See Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir.2001).

**22.** At the time SICO filed its counterclaim, this exemption was set forth in Rule 144(k), 17 C.F.R. § 230.144(k), and the relevant holding period was two years. Since that time, Rule 144 has been amended, and the exemption is now set forth in Rule 144(b)(1). See 72 Fed.Reg. 71546 n. 64.

**23.** An "affiliate," under Rule 144, is "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). See also SEC v. Cavanagh, 1 F.Supp.2d 337, 362 n. 49 (S.D.N.Y.1998).

filed with the SEC.[24] SICO further alleges that it has asked AIG to amend its past Schedule 13D filings and that AIG has indicated that it will not do so, and SICO claims that it has been harmed by AIG's actions in that, because of confusion over whether SICO qualifies for Rule 144's exemption, SICO has been unable to freely transfer its AIG stock.

AIG argues that SICO's counterclaim is not justiciable because SICO's and AIG's interests are not adverse. Under the Declaratory Judgment Act, a court may entertain an action for declaratory judgement only when there is an "actual controversy" between the parties, 28 U.S.C. § 2201(a), a requirement that incorporates the case or controversy limitation on federal jurisdiction of Article III of the Constitution, *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996). In order to qualify as a justiciable controversy within the meaning of Article III, "[t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

AIG argues that because neither AIG's interpretation of the securities laws, nor its opinion of whether SICO is an affiliate, nor its opinion of whether SICO would violate Rule 144 by any given sale of its AIG stock are binding on SICO, there is no "real and substantial controversy admitting of specific relief through a decree of a conclusive character," *id.* at 241, 57 S.Ct. 461, between the parties. SICO, in turn, argues that insofar as it is suffering harm as a result of AIG's dissemination of inaccurate information in the marketplace, the parties' interests are adverse and so a justiciable controversy exists. SICO further asserts that it has a private right of action under Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m(d), and that its counterclaim is therefore, by definition, justiciable.

As an initial matter, the Court notes that it is far from clear that the parties' interests are truly adverse such that it can issue "specific relief" that would adequately resolve the parties' legal obligations. If the Court were, for example, to grant SICO an injunction requiring AIG to amend its past Schedules 13D, that relief would not clarify whether the *SEC* (the relevant administrative body) considers SICO to be an affiliate of AIG under Rule 144 or whether SICO is free to transfer its AIG stock.

In addition, the law does not establish that SICO has a right to sue under Section 13(d) of the Exchange Act. First, SICO does not have a private right of action for damages under Section 13(d). The Second Circuit has held that there is

---

**24.** A Schedule 13D must be filed with the SEC and sent to the issuer by any person who acquires more than 5% of a class of registered equity security. 17 C.F.R. § 240.13d–1. *See also* 17 C.F.R. § 240.13d–101. A corporation filing a Schedule 13D must disclose "each person controlling such corporation." 17 C.F.R. § 240.13d–101 Instruction C. "Control," in turn, is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2 (made applicable to Rule 13D filings by 17 C.F.R. § 240.12b–1). The parties cite no authority specifically on this point, but it would appear, and the Court assumes for purposes of this motion, that a "person controlling" another corporation under Rule 13d would qualify as an "affiliate" under Rule 144–although, as AIG pointed out at oral argument, *see* tr. 7/29/09 at 19, the definition of "affiliate" under Rule 144 is broader than that of "person controlling" under Rule 13d.

no private damages remedy for issuers under Section 13(d), *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir.2002), nor is there a private damages remedy for shareholders under that provision, *id.* at 619 (citing *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir.1989)). While SICO maintains that these holdings do not preclude a finding that a party named in a Schedule 13D may sue for damages under that provision, this argument is strained. "Over the years, the Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor." *Id.* at 618. In order to ascertain if a private right of action exists under a statute, a court should focus on "whether congressional intent to create a private cause of action can be found in the relevant statute." *Id.* at 619. Given that the Second Circuit has found that Section 13(d) of the Exchange Act does not indicate that Congress intended that an action for damages be available to parties whose interests are more directly implicated when a Schedule 13D is filed—i.e., the issuer and the holders of the securities in question—and that SICO points to nothing in the statute indicating a different conclusion with regard to a party in SICO's situation, the Court finds that there is no private right of action for damages under the statute for a party listed as an affiliate and/or controlling person on another party's Schedule 13D.

Second, although in certain contexts, there is a private right of action for injunctive relief under Section 13(d), SICO has not shown that this right extends to parties in its position. In *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir.1971), the Second Circuit held that an issuer may bring an action seeking an injunction to correct allegedly false and misleading statements in a Schedule 13D. In addition, a tender offeror's right to bring an action for injunctive relief under Section 13(d) has been previously recognized in this district. *See E.ON AG v. Acciona, S.A.*, 468 F.Supp.2d 537 (S.D.N.Y.2006). SICO argues that in addition to issuers and tender offerors, parties named as affiliates in a Schedule 13(d) have a right to sue for an injunction to correct a false statement therein.[25] The Court is skeptical of this argument. The rationale of *E.ON*—that it is appropriate to allow tender offerors to sue for injunctive relief under Section 13(d) because they are likely to have enough knowledge of the relevant facts to identify false statements or omissions in Schedules 13D, *see* 468 F.Supp.2d at 551—does not necessarily extend to SICO's situation.

██ But even assuming, *arguendo*, that SICO's claim is justiciable, and again assuming, *arguendo*, that SICO does have a private right of action under Section 13(d) to seek an injunction, it would not be a sound use of the Court's judicial power to grant SICO the relief it here seeks. SICO's counterclaim, to the extent that it is valid at all, is ultimately based on a request for injunctive relief, and the decision whether to grant such relief rests within the court's equitable discretion.[26] *See Weinberger v. Romero–Barcelo*, 456

---

**25.** The parties do not dispute that there is no private right of action under Rule 144. *See Muessig v. Nozko*, No. Civ. H–77–72, 1980 WL 340259, at *1 (D.Conn. Nov. 7, 1980).

**26.** In its order determining which issues in this case would be tried to a jury and which would be tried to the Court, the Court did make a preliminary finding, in light of the federal policy favoring jury trials and SICO's failure to indicate what type of action underlies its declaratory judgment claim, that this claim was triable to a jury (a right the parties subsequently waived). *See* Order dated June 4, 2009 at 11. The Court also expressed, however, considerable skepticism as to the justiciability of SICO's counterclaim but noted that the parties had not addressed this issue beyond making conclusory assertions.

U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). Moreover, in any action for a declaratory judgment, the court has discretion over whether to exercise jurisdiction and over whether to grant declaratory relief. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–88, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

SICO acknowledges that in the period of over four years since it first demanded, in July 2005, that AIG amend its Schedules 13D, *see* Counterclaim of Plaintiff Starr International ¶ 21, it has never applied to the SEC for a determination of whether it is an "affiliate" of AIG for the purposes of Rule 144. *See* tr. 7/29/09 at 4. SICO also concedes, *see id.* at 8, that if and when it wishes to sell shares that qualify as restricted under Rule 144, it could readily apply to the SEC for a "no action" letter stating that it qualifies for the relevant exemption. Meanwhile, the SEC is the agency charged by Congress with administering the statutes and rules at issue and possesses considerable expertise in making the legal and factual determinations that SICO's counterclaim calls for. Under these circumstances, SICO finds itself in much the same position as a plaintiff seeking equitable relief when it has an adequate remedy at law, *see National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 n. 22, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) ("It is a fundamental principle of long standing that a request for an injunction will not be granted as long as an adequate remedy at law is available."), with the added consideration that the Court is well aware of the

advantages of allowing the SEC an opportunity to address the issue at hand, *cf. MFS Securities Corp. v. New York Stock Exchange, Inc.*, 277 F.3d 613, 620–22 (2d Cir.2002) (finding that, under the doctrine of "primary jurisdiction," it is appropriate to refer issues implicating the securities laws to the SEC for administrative review before adjudicating the dispute at hand).

In this situation, declaratory relief is not appropriate. Rather, SICO may apply to the SEC for a ruling on its status under Rule 144, either by seeking a "no action" letter or through some other appropriate mechanism. If the SEC declines to give SICO a ruling on this issue, SICO may then reinstate this claim, and the Court will make a determination as to the justiciability and merits of SICO's counterclaim.

Accordingly, SICO's counterclaim is hereby dismissed, but without prejudice.

### FINAL JUDGMENT

Given the parties' stipulations, the prior rulings by Judge Jones, the jury's verdict, and this Court's final determinations, Final Judgment in this case will now be entered, as follows:

(1) In accordance with the stipulation of the parties, judgment shall be entered in favor of SICO and against AIG on Count I (Replevin) and Count II (Conversion) of SICO's complaint. AIG shall deliver to SICO the property set forth on Schedule A to the Stipulation of Judgment dated March 20, 2009, notwithstanding any appeal that AIG may pursue on its counterclaims. No compensatory damages or other monetary relief is awarded with respect to these claims.

(2) In accordance with Judge Jones' Order dated June 23, 2008, SICO's motion for summary judgment is hereby granted with respect to AIG's First Counterclaim

---

*Id.* at 11. In light of the parties' further arguments and clarifications, the Court has

now reconsidered and determined that SICO's counterclaim is equitable in nature.

(Breach of Contract–Deferred Compensation Program), Second Counterclaim (Breach of Contract–Management of the Deferred Compensation Program), Third Counterclaim (Unjust Enrichment), and Fourth Counterclaim (Constructive Trust) and those counterclaims are hereby dismissed with prejudice.

(3) In accordance with this Court's ruling from the bench on June 15, 2009, the Court hereby dismisses AIG's Seventh Counterclaim (Declaratory Judgment Act, 28 U.S.C. § 2201) without prejudice.

(4) In accordance with the verdict of the jury rendered on July 7, 2009 finding no liability for SICO on AIG's Sixth Counterclaim (Conversion), the Court hereby dismisses that counterclaim with prejudice.

(5) For the reasons stated above finding no liability for SICO on AIG's Fifth Counterclaim (Breach of Fiduciary Duty), the Court hereby dismisses that counterclaim with prejudice.

(6) For the reasons stated above, the Court hereby dismisses, without prejudice, SICO's counterclaim (For a Declaratory Judgment Pursuant to 28 U.S.C. § 2202).

SO ORDERED.