**Renata MAGNONI, Plaintiff,**

v.

**SMITH & LAQUERCIA, LLP et al., Defendants.**

**No. 07 Civ. 9875 (VM).**

United States District Court, S.D. New York.

March 22, 2010.

David Abrams, David Abrams, Attorney at Law, New York, NY, for Plaintiff.

Thomas Everett Chase, Rottenberg Lipman Rich, P.C., New York, NY, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Renata Magnoni ("Magnoni") brought this action against defendants Smith & Laquercia, LLP ("Smith & Laquercia") and Thomas Laquercia ("Laquercia") (collectively, "Defendants") asserting three claims related to her employment at Smith & Laquercia: (1) a claim for unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and New York Labor Law §§ 190 *et seq.;* (2) a claim for unpaid vacation time under New York Labor Law §§ 190 *et seq.;* and (3) a hostile work environment claim in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107. Defendants asserted a breach of fiduciary duty counterclaim on the theory that Magnoni improperly used Smith & Laquercia resources for her own process-serving business.[1]

The Court conducted a bench trial on February 1 and 2, 2010 to adjudicate these claims. By Order dated February 11, 2010, the Court dismissed Magnoni's claims, *see Magnoni v. Smith & Laquercia,* 07 Civ 9875, 2010 WL 582225 (S.D.N.Y. Feb. 11, 2010), and indicated that its findings, reasoning and conclusions would be set forth in a subsequent opinion. The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT [2]

#### A. *Magnoni's Testimony Was Not Credible*

Magnoni's case relied almost entirely on her testimony to establish the amount of overtime she worked, her entitlement to vacation time, and Laquercia's long pattern of sexually harassing her. Her credibility as a witness was therefore key to her prevailing on any of her claims.

The Court concludes that Magnoni was not a credible witness. The Court notes that "[c]redibility determinations are among the most subtle a fact-finder is called upon to make" because "they involve complex assessments of demeanor, bias, motive, consistency, probability, memory, and a host of other factors." *Starr Intern. Co., Inc. v. American Intern. Group, Inc.,* 648 F.Supp.2d 546, 550 (S.D.N.Y.2009).

---

1. The relevant factual background and prior proceedings in this action are reported as *Magnoni v. Smith & Laquercia,* 661 F.Supp.2d 412 (S.D.N.Y.2009).

2. While the Court has reviewed and considered all of the live testimony and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to its legal conclusions.

Further, self-interest "creates such a powerful incentive to shade the truth that it is unusual for an interested witness to be totally candid." *Id.* In addition to the logical flaws, inconsistencies and bias in Magnoni's testimony described below, the Court also took into account Magnoni's demeanor in the courtroom and other linguistic and logical twists on display during her lengthy testimony.

Magnoni's credibility problems begin with her refusal to concede that she worked more than a few minutes a day on a process-serving business that she ran in addition to her employment at Smith & Laquercia. Magnoni testified that this business, operating under the name Contessa, accounted for only twenty minutes of her time a week during business hours at Smith & Laquercia. (*See* Trial Transcript ("Trial Tr.") at 352–53.) But this assertion is flatly contradicted by other evidence in this case, including notarized affidavits of service performed by Contessa, tax forms and testimony from other witnesses. Defendants introduced into evidence a representative sample of affidavits indicating that Contessa effectuated service several hundred times a year. (*See* Defendants' Exhibits ("Def. Ex.") 13, 21.) IRS forms indicate that Magnoni earned a substantial supplemental income from Contessa. (*See* Def. Ex. 3.) Witnesses also testified that Magnoni was constantly on her cell phone coordinating Contessa matters while ostensibly at work at Smith & Laquercia. (*See* Trial Tr. at 280, 296, 312, 327.) Magnoni herself testified that there were occasions in which she personally served process. (*See id.* at 74.) This evidence persuades the Court that Magnoni spent far more than twenty minutes a week-approximately four minutes a day-on Contessa business while at Smith & Laquercia. Magnoni's minimizing account of this time is contradicted by logic and documentary evidence on the record and thus undermines her credibility.

Magnoni also claimed in her complaint and testified on direct examination that she was due overtime by Smith & Laquercia for work performed in 2002, but reversed this position on cross-examination by admitting, upon being presented with Smith & Laquercia's payroll records, that she had in fact been paid overtime in 2002. (*See id.* at 54–57.) Whether this reversal was caused by a deliberate lack of candor or faulty memory, in the Court's view it further diminished Magnoni's credibility.

In addition, Magnoni evinced continued confusion or willful ignorance about how many overtime hours she worked. She commenced this litigation asserting a claim for overtime based on an erroneous view of the legal standard by which overtime work is determined, grounding her theory on time worked exceeding eight hours per day, rather than the applicable forty hours per week. Yet, the defense established that Magnoni, even at the conclusion of trial, still did not calculate her overtime using the correct legal standard, *see* 29 U.S.C. § 207, and did not account in any convincing way for time she spent on Contessa business, while continuing to insist that she was entitled to overtime pay. (*See* Trial Tr. at 354–64.)

Magnoni's case also lacked readily available corroboration. In connection with her hostile work environment claim, for example, Magnoni testified to approximately eighteen distinct incidents of sexual harassment, many of which allegedly happened in the presence of other people. (*Id.* at 29–46.) But Magnoni presented a second witness with testimony concerning only three of these instances and this corroboration was, in the Court's view, less than air-tight.

In the first instance, Magnoni testified that in November 2006 she attended a

business lunch with attorneys from Smith & Laquercia (including Laquercia, Edwin Smith ("Smith") and Reed Podell ("Podell")) and two representatives from a company that did medical evaluations for lawsuits, Lucas Clementz ("Clementz") and Bill Polikoff ("Polikoff"). (*See id.* at 34.) According to Magnoni, Laquercia asked in front of everyone at the lunch if Magnoni and Clementz were "banging." (*Id.*) Clementz, who characterized himself as a "friend" of Magnoni's, testified that he heard Laquercia ask that question. (*See id.* at 184, 187.) On the contrary, Polikoff, who unlike Clementz had no prior acquaintance with Magnoni, testified that he would have recalled such a brazen breach of propriety and that he did not recall such an incident occurring at the lunch. (*Id.* at 317–19.) Podell and Smith (both current partners at Smith & Laquercia) also denied that Laquercia made these comments publicly at the lunch. (*Id.* at 326, 309.)[3]

In the second and third instances, Magnoni presented testimony from Nancy O'Connor ("O'Connor"), a former Smith & Laquercia employee, to corroborate Magnoni's testimony that on an unspecified date Laquercia told Magnoni to remove her clothing and perform oral sex on him at the end of a business day. (*See id.* at 208–09.) O'Connor was also presented to corroborate Magnoni's testimony that in 2005 or 2006 when Magnoni told Laquercia that her mother had a cyst on her breast, Laquercia said that Magnoni's mother "needs someone to suck on her tit. She needs a man." (*Id.* at 208.)[4]

But O'Connor's credibility is undermined by other evidence. O'Connor has retained Magnoni's trial counsel to sue Smith & Laquercia in an unrelated lawsuit for workplace discrimination, in which Magnoni has agreed to testify in her favor. (*See id.* at 213.) She described herself as a friend of Magnoni, and testified that Magnoni regularly drover her to work at Smith & Laquercia under car-pool arrangement with Magnoni while both were employed there. (*See id.* at 209, 212–15.)

Moreover, in addition to this evidence of bias or other personal interest, Defendants effectively impeached O'Connor. O'Connor was asked whether she had given a deposition on Magnoni's behalf in an unrelated personal injury lawsuit. O'Connor answered that she had not, but was quickly contradicted by defense counsel's reading from O'Connor's deposition for this case where she said the opposite. (*See* Trial Tr. at 213–14.) Accordingly, the Court finds that O'Connor was not a credible witness.

Magnoni's other witnesses, Doreena Davidson ("Davidson") and Nancy Nicotra ("Nicotra"), were no more helpful to her cause. Davidson worked at Smith & Laquercia for a total of eight months in 2006 and 2007. Davidson testified that she heard Laquercia comment about one female employee's breasts, but offered no testimony about similar remarks made towards Magnoni. (*See id.* at 197–201.)

Nicotra, who worked as an attorney at Smith & Laquercia for approximately two

---

**3.** Magnoni also testified that Laquercia referred to her as "voluptuous" and made other comments about her appearance to Clementz at the Smith & Laquercia Christmas party in 2006. (*See id.* at 31–34.) Clementz did not remember being at this party, but did recall Laquercia making similar comments to him at a different party. (*See id.* at 187–192.) In any event, as noted below, Laquercia himself

admitted to making similar comments during Magnoni's employment at Smith & Laquercia.

**4.** According to Magnoni, O'Connor was also present when Laquercia told Magnoni that she "would like to be debauched," *id.* at 41, but O'Connor did not corroborate this testimony.

years between 2001 and 2003 and had an office "not that far" from Laquercia's, testified that she never heard Laquercia make any sexual comments to anyone at Smith & Laquercia. (*See id.* at 222–227.)

This equivocal array of evidence was all Magnoni offered to bolster her credibility and she did so in support of only three of her specific allegations of sexual harassment. Though Magnoni testified that Laquercia stuck his hand down her skirt in front of a Smith & Laquercia employee named Laura, such Laura was not called. (*See id.* at 36–37.) Magnoni testified that Laquercia called her "voluptuous" and made other comments about her appearance to an office visitor but that visitor was not identified by name much less called to the witness stand. (*See id.* at 38–39, 152–53.) Magnoni testified that Laquercia constantly sent her sexually explicit emails, but she produced none of these messages. (*See id.* at 44, 163.) She testified that she used a recording device at the office and on her telephone at home to secretly tape certain conversations about employment disputes with Smith & Laquercia personnel, but again presented no evidence of any such recording of statements by Laquercia, which Magnoni said occurred almost daily for sixteen years, to substantiate her charges in this lawsuit. (*See id.* at 125–35.) This lack of seemingly readily available corroboration for Magnoni's testimony weighs further against her credibility.

In the Court's view, Magnoni also displayed a tendency to distort Laquercia's relatively innocuous behavior into sexual misconduct. Magnoni testified that one year at the firm's Christmas party, Laquercia told Magnoni to keep his wife occupied while Laquercia went "into his office for a quickie" with his current girlfriend. (*Id.* at 39.) In context, the Court found Magnoni's account not only

bizarre, but implausible. Laquercia maintained that it was "just the reverse.... My wife was in a wheelchair. She was a paraplegic. And she was seated in a Quickie. That's the brand name of that titanium and very expensive wheelchair." (*Id.* at 246.) Laquercia further testified that though his wife and girlfriend did overlap at the party for a few moments, he "didn't say that [he] was having a quickie with anyone." (*Id.* at 246–47) The Court takes judicial notice that "Quickie" is the brand name of a wheelchair, and finds that Laquercia's explanation is more plausible than Magnoni's. *See* Welcome to Quickie-Wheelchairs, http://www.quickie-wheelchairs.com/ (last visited Mar. 18, 2010); Federal Rules of Evidence 201; *Patsy's Italian Restaurant, Inc. v. Banas*, 575 F.Supp.2d 427, 443, n. 18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.") (*citing Wang v. Pataki*, 396 F.Supp.2d 446, 458 n. 2 (S.D.N.Y.2005) (*citing Hotel Employees & Rest. Employees Union, Local 100 v. N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002))); *United States v. Bari*, 599 F.3d 176, 179–81 (2d Cir.2010).

In addition to these challenges to Magnoni's veracity, Defendants also called Magnoni's credibility and integrity into question in other ways. In the first few questions of Magnoni's cross-examination, counsel for Defendants demonstrated that Magnoni had been misleading during her deposition by failing to disclose that she had a lawsuit pending against the owners of the building containing Smith & Laquercia's offices. (*See id.* at 51–54.) Magnoni also admitted to attempting to secretly tape record Laquercia and other attorneys at Smith & Laquercia about this lawsuit and other employment disputes. (*See id.* at 125–35.) Magnoni's brother

had also previously sued Smith & Laquercia for legal malpractice, which was another subject for the secret tape recordings of employees of Smith & Laquercia. (*See id.* at 129–30.)

It also appears that Magnoni did not properly report her income from Contessa to the IRS. Magnoni testified that Contessa was employed by entities other than Smith & Laquercia, but the IRS forms indicating Contessa's reported income include payments attributable only to Smith & Laquercia. (*See id.* at 92–93, 95–96.) For example, in 2006, Smith & Laquercia paid Contessa $49,520. (*See* Def. Ex. 12.) Magnoni in turn reported $49,520 to the IRS as the entirety of Contessa's income for the year. (*See* Def. Ex. 3.) Moreover, though Magnoni testified that Smith & Laquercia was Contessa's largest client (and that other firms comprised only a small portion of the business), the record indicates otherwise. For example, of 230 affidavits of service Contessa made in 2006, only 9 were on behalf of Smith & Laquercia. (*See* Def. Ex. 13, 21.) If Contessa had clients in addition to Smith & Laquercia, as Magnoni testified and as documentary evidence confirms, she should have reported more income to the IRS on behalf of Contessa. Magnoni blames these discrepancies on her accountant, but she also admits paying Contessa's process servers "off the books"—another instance of conduct that may bear on the extent of Magnoni's truthfulness and honesty. (*See* Trial Tr. at 97, 99.)

At the end of her employment at Smith & Laquercia, Magnoni persisted in arriving at the office as early as between 5:00 and 6:00 in the morning, when there was little useful work for her to do for Smith & Laquercia, and leaving for the day at between 2:00 and 3:00 p.m., just prior to one of the busiest periods of the day for the firm and when she was most needed on the job. (*See id.* at 10, 286–89, 309–11; Def.

Ex. 5.) It was not clear why Magnoni maintained a work schedule that substantially advanced her own convenience rather than the business of her employer and her office duties. But from all the evidence in context it appeared that at least in part Magnoni chose working hours that enabled her to perform some services for Contessa. Magnoni's failing to adhere to a workday determined by the interests of the firm eventually led to her termination. (*See id.* at 286–89; Def. Ex. 7.)

Magnoni was also unwilling to testify about relevant issues on cross-examination. Most striking was Magnoni's refusal to specify why she left a higher-paying job in 2000 after working only two months to return to Smith & Laquercia. During cross-examination about why she quit the higher-paying job, Magnoni answered "I just wasn't happy there," but aside from unexplained displeasure about the number of so-called "per diem" attorneys working at her new employer, she did not "remember offhand" any other reason she did not like the other job, only that "[t]here were other issues, which I don't think is a matter of fact for this case. Why I left the other firm. It does not matter. I didn't like it. I didn't get along with the attorney. I don't feel that it's an issue here." (*Id.* at 118–19.)

Though some of these matters may be tangential to Magnoni's instant lawsuit, the cumulative effect of these demonstrations of her prior untruthfulness, mischaracterization of events and lack of complete candor further persuade the Court that Magnoni's testimony on the issues material to this litigation was not credible.

B. *Magnoni's Employment at Smith & Laquercia and Her Operation of the Contessa Process Serving Business*

Smith & Laquercia, a law firm primarily engaged in defense work for insurance

companies, was founded in 1980 by Smith and Laquercia. Magnoni was hired as a paralegal at Smith & Laquercia in June 1990. At all times relevant to this lawsuit, the firm had more than four employees and more than $500,000 in annual revenue.

While employed at Smith & Laquercia, Magnoni began operating a process-serving business known as Contessa. Laquercia helped her set up the business and Smith & Laquercia was one of Contessa's clients. (*See id.* at 11, 279–80.) Magnoni operated Contessa, in part, from Smith & Laquercia's office. (*See id.* at 255, 296–97.) Contessa's business grew and in the period immediately preceding Magnoni's termination, she was frequently on her cell phone at Smith & Laquercia managing the business. (*See id.* at 312.)

In 2000, Magnoni left Smith & Laquercia to work for another attorney at a substantially higher salary. She left that job a few months later and returned to Smith & Laquercia. (*See id.* at 49–51.)

In the spring of 2006, Susan Saxe ("Saxe"), Smith & Laquercia's office manager, circulated a memorandum prepared by Laquercia that detailed Smith & Laquercia's policies for the accrual of vacation and sick time. (*See id.* at 337.) According to this policy, 10% of an employee's vacation and sick time accrued each month. (*See id.* at 335–339.)

Magnoni was fired from Smith & Laquercia in April 2007. (*See id.* at 4.)

### C. Charges of Laquercia's Improper Sexual Behavior

Laquercia testified that he told Magnoni graphic details of his sex life with other women. In particular, at some point in 1998 Laquercia told Magnoni that he had received "the best blow job" over the weekend. (*Id.* at 244.) On another occasion, he "blurted" out to Magnoni how one

evening he "ended up having sex in the car" with a woman named Joanne. (*Id.* at 252–53.) Laquercia testified that these exchanges occurred at Magnoni's instigation in the context of a close friendship that had developed between them spanning sixteen years. (*See id.* at 237–38.) According to Saxe, Magnoni never made a formal written complaint about this behavior but did informally tell Saxe that Laquercia had made sexual comments about other women to her. (*See id.* at 333–34.) Laquercia further testified that he occasionally referred to Magnoni as "voluptuous." (*Id.* at 247.) He also sometimes hit the back of her knee with his knee, as he did to other employees of both genders as a sign to "move on" from talking in office hallways. (*See id.* at 242–43.)

### D. Magnoni's Demeanor at Smith & Laquercia

Magnoni's former co-workers at Smith & Laquercia described her as "friendly" and "business-like" when interacting with Laquercia. (*Id.* at 334, 347.) Magnoni did not shy from confrontation with Laquercia and "would defend herself vigorously" if needed but otherwise had "very friendly, jovial" interactions with Laquercia. (*Id.* at 325.)

In particular, Magnoni and Laquercia spoke about their family connections, including Magnoni's assertion that through ancestors in Italy she was a countess, though that title meant "[a]bsolutely nothing today." (*Id.* at 160.) Magnoni also discussed her dating life with Laquercia, including her mother's disapproval of some of the men she was seeing. (*See id.* at 160–161.) Laquercia also testified to these conversations and noted that Magnoni gave Laquercia a page from her father's address book showing that Magnoni's father had once done business in Italy with Laquercia's cousin. (*See id.* at 270.) La-

quercia further testified to the closeness of their relationship by noting that Magnoni gave him "the most beautiful" set of silver and gold cufflinks on his fiftieth birthday, the most expensive gift he received that year, aside from the one from his wife. (*Id.* at 271.)

In addition to this relationship with Laquercia, Magnoni frequently and for several years joked with Podell that "you're so cute. We'll make a baby." (*Id.* at 323, 335.) Though Podell was not offended by these jokes, he described Magnoni as a "boisterous, bawdy person" who was "assertive" and had a good sense of humor. (*Id.* at 322.)

The Court credits these descriptions of Magnoni and adopts them as a finding of fact to establish the context of the relationship between Magnoni and Laquercia by which the reaction of a person in Magnoni's position may reasonably be evaluated.

## II. *CONCLUSIONS OF LAW*

### A. *Magnoni's Claim for Unpaid Overtime*

■ The Court concludes that Magnoni did not establish by a preponderance of the evidence that she was owed unpaid overtime wages. First, Magnoni did not use a forty-hour work week to calculate overtime. (*See id.* at 354–364.) She presented no documentation whatsoever for any overtime she allegedly worked prior to 2006, and, confronted with Smith & Laquercia's payroll records, admitted that in fact she had been paid overtime in 2002, Pertaining to 2006–07, Magnoni sought to introduce a daily record of overtime she claims she worked. (*See id.* at 23–24.) But this account was prepared by Magnoni herself based on her entries and was not corroborated by any official employer business records. The Court therefore did not admit the proffered report into evidence.

Next, Magnoni did not account for the substantial amount of time she worked on Contessa matters while at Smith & Laquercia's office. Finally, if the Court were to credit Magnoni's testimony that Smith & Laquercia was Contessa's primary client, Magnoni cannot "double count" overtime hours for time she spent administering Contessa's serving of documents for Smith & Laquercia because she was separately compensated by Smith & Laquercia through Contessa for this work.

In sum, Magnoni's presentation of her overtime claim was unsubstantiated or exceedingly unclear. The Court cannot find that she carried her burden with sufficient evidence on this claim. *See Grochowski v. Phoenix Const.,* 318 F.3d 80, 87–88 (2d Cir.2003) (plaintiff in FLSA overtime action must "produce[ ] sufficient evidence to show the amount and extent of [overtime] work as a matter of just and reasonable inference.")

### B. *Magnoni's Claim for Unpaid Vacation Days*

The Court similarly concludes that Magnoni did not carry her burden with sufficient evidence to make out her claim about unpaid vacation time. Magnoni claims she was owed weeks of vacation time because her vacation time for all of 2007 accrued to her in one piece on January 1, 2007. This theory relies entirely on Magnoni's testimony that Smith & Laquercia's office manager orally communicated to Magnoni that the memo distributed in 2007 explaining Smith & Laquercia's monthly accrual scheme did not apply to Magnoni. (*See* Trial Tr. at 138–44.) Moreover, even assuming Saxe made this statement, Magnoni presented no evidence establishing that Saxe possessed authority to make such a representation with binding effect on Smith & Laquercia. Since the Court does not credit this testimony, the Court con-

cludes that Magnoni was not owed any unpaid vacation time because the amount she seeks had not yet accrued to her.[5]

### C. *Magnoni's Hostile Work Environment Claim*

■ Adjudication of Magnoni's hostile work environment claim in this case fundamentally rests upon a credibility determination. Magnoni testified that Laquercia sexually harassed her on an almost-daily basis during her employment at Smith & Laquercia, a period extending over sixteen years. Laquercia denies this behavior occurred. (*See id.* at 237–54.) Laquercia admits that he told Magnoni explicit details about his sex life on at least two occasions, that he called Magnoni "voluptuous", and that he occasionally knocked the back of her knee with his knee. He characterizes these interactions as a natural part of a close friendship formed during their many years of working together. As described above, weighing the evidence in the context of the Court's finding concerning Magnoni's lack of credibility, the Court credits Laquercia's testimony over Magnoni's. Laquercia's characterization is further supported by the testimony of Magnoni's co-workers describing Magnoni as having a close, friendly relationship with Laquercia and characterizing Magnoni herself as "bawdy" and prone to making jokes of a sexual nature, such as the testimony about having a child with Podell.

■ The Court evaluates these facts pursuant to the New York City Human Rights Law, which covers more conduct than either federal or New York state sexual harassment laws. *See Williams v.*

*New York City Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 36–42 (1st Dep't 2009); *Selmanovic v. NYSE Group, Inc.*, 06 Civ 3046, 2007 WL 4563431 (S.D.N.Y. Dec. 21, 2007) (for sexual harassment claims, "New York City Human Rights Law was intended to be more protective than the state and federal counterpart" (citations and quotation marks omitted)). The Court is also not unmindful that "[t]he sexualization of the workplace imposes burdens [of conformity] on women that are not borne by men." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1505 (M.D.Fla.1991). But the New York City Human Rights Law does not constitute a "general civility code" and behavior is not actionable if, "in view of plaintiff's own experience and interpretation, [the conduct is] nothing more than petty slights or trivial inconveniences." *Id.* at 40–41 (citations omitted).

Given this framework and taking into account Magnoni's relationship with Laquercia, as portrayed above, her overall demeanor at Smith & Laquercia (including her co-workers descriptions of her personality and her voluntary return to the firm after leaving for a higher-paying job) and the Court's finding of contradictions, absence of corroboration, and lack of credibility in Magnoni's testimony, the Court concludes that Magnoni did not carry her burden in proving by a preponderance of the evidence a hostile work environment claim.

In the alternative and resolving all statute of limitations ambiguities in Magnoni's favor[6], the Court concludes that Defen-

---

5. The Court also notes that Magnoni presented no pay stubs or other evidence detailing her compensation during the period in question for either her overtime or unpaid vacation claims. Such material was introduced by Defendants. (*See* Def. Ex. 4.)

6. The New York Human Rights law has a three-year statute of limitations for sexual harassment claims. *See Williams,* 872 N.Y.S.2d 27 at 41. This three-year period presents additional problems for Magnoni's claim because Magnoni filed her complaint in November 2007 and any incidents alleged to

dants presented sufficient evidence that a reasonable person in Magnoni's employment relationship claiming discrimination would not have perceived Laquercia's behavior—telling a crude anecdote from his sex life with another woman, and occasionally referring to Magnoni as voluptuous and knocking her knee—as sexual harassment through creating a hostile work environment sufficient to state a claim under the New York City Human Rights Law standard.

### D. *Smith & Laquercia's Breach of Fiduciary Duty Counterclaim*

■ Both Laquercia and his law partner Smith testified that they knew of Magnoni's process serving business and offered the resources of their firm to Magnoni to further her business. Their testimony establishes that Magnoni's coordination of Contessa-related matters during working hours at Smith & Laquercia's office occurred openly and with both Smith's and Laquercia's consent. (*See* Trial Tr. at 279–80, 285, 312.) Defendants' assertions that Magnoni was covertly utilizing firm resources without their knowledge were not developed at trial and remain inadmissible hearsay or entirely conclusory. (*See id.* at 296–97.)

The Court therefore concludes that Magnoni did not breach a fiduciary duty owed to Smith & Laquercia. *See 30 FPS Productions, Inc. v. Livolsi*, 68 A.D.3d 1101, 891 N.Y.S.2d 162, 164 (2d Dep't 2009) (employee breaches fiduciary duty to employer only when making "improper use"

of employer's resources (citations omitted)).

### III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the Clerk of the Court is directed to enter judgment dismissing the complaint of plaintiff Renata Magnoni; and it is further

**ORDERED** that the Clerk of the Court is directed dismiss the counterclaim of defendants Smith & Laquercia, LLP and Thomas Laquercia; and it is further

**ORDERED** that the Clerk of the Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

---

have occurred before November 2004 are not actionable. Of the two sexual anecdotes Laquercia admits to, one was told in 1998, *see Trial Tr.* at 244, and the other had no date attached to it save for indications that Laquercia related it around the time of the lunch with Clementz in 2006. (*See id.* at 252 ("I was trying to encourage her ... because I

thought she and Mr. Clementz would make a nice couple.")). Further, the occasional incidents of knee-knocking and labeling of Magnoni as "voluptuous" that Laquercia admits to had no firm dates attached to them and, given the credible evidence in this case, could have just as easily last occurred before November 2004 as after that time.